IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
No. 25-2366

_____

DAVID MCDONALD, ET AL.,

Plaintiffs-Appellants,

v.

TRUSTEES OF INDIANA UNVIERSTIY, ET AL.,

Defendants-Appellees

and

STATE OF INDIANA,

Intervenor/Defendant-Appellee

_____

On Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division
No. 1:24-cv-1575-RLY-CSW
The Honorable Richard L. Young, Judge

_____

**BRIEF AND SHORT APPENDIX OF APPELLANT**
_____

Stevie J. Pactor
*Counsel of Record*
Kenneth J. Falk
Gavin M. Rose
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
spactor@aclu-in.org
kfalk@aclu-in.org
grose@aclu-in.org

Attorneys for Appellants

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2366

Short Caption: McDonald et al. v. Trustees of Indiana University et al

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
David McDonald, James Scheurich, Steven Alan Carr, David G. Schuster

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
ACLU of Indiana

(3)     If the party, amicus or intervenor is a corporation:

   i)     Identify all its parent corporations, if any; and
   N/A

   ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
   N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: s/ Stevie J. Pactor          Date: 9.8.2025

Attorney's Printed Name: Stevie J. Pactor

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes [✓]     No [ ]

Address: 1031 E. Washington St.

Indianapolis, IN 46204

Phone Number: 317-635-4059          Fax Number: 317-635-4105

E-Mail Address: spactor@aclu-in.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As    Clear Form

Appellate Court No: <u>25-2366</u>

Short Caption: <u>McDonald, et al. v. Trustees of Indiana University, et al.</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>David McDonald, James Scheurich, Steven Alan Carr, David G. Schuster</u>

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>ACLU of Indiana</u>

_____

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

<u>N/A</u>

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

<u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>s/ Gavin M. Rose</u>    Date: <u>September 14, 2025</u>

Attorney's Printed Name: <u>Gavin M. Rose</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: <u>1031 E. Washington St.</u>

<u>Indianapolis, IN  46202</u>

Phone Number: <u>317/635-4059</u>    Fax Number: <u>317/635-4105</u>

E-Mail Address: <u>grose@aclu-in.org</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2366

Short Caption: McDonald et al. v. Trustees of Indiana University et al

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

David McDonald, James Scheurich, Steven Alan Carr, David G. Schuster

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

ACLU of Indiana

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Kenneth J. Falk     Date: 9.14.2025

Attorney's Printed Name: Kenneth J. Falk

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [ ]   No [✓]

Address: 1031 E. Washington St.

Indianapolis, IN 46204

Phone Number: 317-635-4059     Fax Number: 317-635-4105

E-Mail Address: kfalk@aclu-in.org

rev. 12/19 AK

# Table of Contents

**Table of Authorities**............................................................................................iii

**Jurisdictional Statement**.....................................................................................1

**Statement of the Issues**.......................................................................................1

**Statement of the Case**..........................................................................................3

    I. Statement of the Facts..................................................................................3

       A.  The challenged statute and the Universities' policies.............................3

       B.  The Professors and the impact of the Act on their speech ....................8

          1.  Professor David McDonald ............................................................8

          2.  Professor James Scheurich ...........................................................11

          3.  Professor Steven Alan Carr .........................................................13

          4.  Professor David F. Schuster .........................................................16

       C.  The Professors exercise their academic freedom in determining the content and pedagogy of their courses.............................................19

    II. Procedural history .....................................................................................20

**Summary of the Argument**................................................................................21

**Argument** ...........................................................................................................23

    I.  Standard of review......................................................................................23

    II. The Professors have standing to bring their claims, which are ripe, and the dismissal of their claims was erroneous .................................................23

      A.  The Universities have implemented the policies required by the Act, and these policies are in effect and apply to the Professors.....................24

      B.  The Professors' speech is both compelled and chilled by the Act and university policies .................................................................................25

      C.  The Professors' fear of enforcement is well-founded..............................27

    III.     The Professors are entitled to a preliminary injunction enjoining the operation of the challenged Act and university policies against them .......................................................................................29

      A.  Legal Standard .....................................................................................29

      B.  The Professors are likely to succeed in their claims that the Act and the university policies violate their First Amendment right to academic freedom ..........................30

          1.  The First Amendment protects the Professors' speech, and the Act and university policies impinge upon the Professors' protected expression .............30

          2.  Heightened scrutiny applies to evaluate prior restraints on government-employee speech...........................................................32

          3.  The State has no interest in this regulation of the Professors' speech ...............34

4.  The Professors' interest in their academic freedom outweighs the State's attempted justification of the Act ...................................................................37

C.  The other requirements for the grant of a preliminary injunction are met ..............41

1.  Without an injunction, the Professors will suffer irreparable harm for which there is no adequate remedy at law .................................................................41

2.  The balance of harms favor the Professors and the public interest will not be disserved by an injunction ..............................................................................42

**Conclusion** .....................................................................................................................**42**

**Certificate of Compliance** ...........................................................................................44

# Table of Authorities

## Cases

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023).....................................................38, 39

*Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550 (4th Cir. 2011).........33

*Ambrosia Land Invs., LLC v. Peabody Coal Co.*, 521 F.3d 778 (7th Cir. 2008)........31

*Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274 (7th Cir. 2020)...........................8

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011)..........................................43, 45

*Brown v. Kemp*, 86 F.4th 745 (7th Cir. 2023).........................................27, 28, 43, 44

*Carr et al. v. Trustees of Purdue University*, 1:24-cv-1578-JRS-TAB.......................21

*Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006).................................46

*Connick v. Myers*, 461 U.S. 138 (1983).....................................................................36

*Crue v. Aiken*, 370 F.3d 668 (7th Cir. 2004) ...............................................36, 37, 41

*Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012).............23, 27

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014).......................................................33

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................45

*Garcetti v. Ceballos*, 547 U.S. 410 (2006)...........................................................33, 42

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588 (7th Cir. 1984) ....32

*Heim v. Daniel*, 81 F.4th 212 (2d Cir. 2023)...................................................34, 41, 42

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967) ...............41

*Kilborn v. Amiridis*, 131 F.4th 550 (7th Cir. 2025) .................................23, 33, 38, 41

*Lane v. Structural Iron Workers Loc. No. 1 Pension Tr. Fund*, 74 F.4th 445 (7th Cir. 2023) ........................................................................................................................32

*Lukaszczyk v. Cook Cnty.*, 47 F.4th 587 (7th Cir. 2022).......................................24, 25

iii

*Massachusetts v. Oakes*, 491 U.S. 576 (1989) ............................................................ 44

*McCarthy v. Fuller*, 810 F.3d 456 (7th Cir. 2015) ...................................................... 36

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) .................................................. 33

*Milwaukee Police Ass'n v. Jones*, 192 F.3d 742 (7th Cir. 1999) ................................ 37

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) .................................................... 39, 40

*Nowlin v. Pritzker*, 34 F.4th 629 (7th Cir. 2022) ........................................................ 24

*Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566 (6th Cir. 2002) ....... 46

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois.*, 391 U.S. 563 (1968) ........................................................................................................... 35, 36

*T.H.E. Ins. Co. v. Olson*, 51 F.4th 264 (7th Cir. 2022) ............................................... 25

*Trejo v. Shoben*, 319 F.3d 878 (7th Cir. 2003) ........................................................... 41

*Turnell v. CentiMark Corp.*, 796 F.3d 656 (7th Cir. 2015) .......................................... 32

*United States v. Kaun*, 827 F.2d 1144 (7th Cir. 1987) ............................................... 36

*United States v. Nat' Treasury Emps. Union*, 513 U.S. 454 (1995) ............... 36, 37, 41

*Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021) ...................................................... 25

*Virginia v. Am. Booksellers Ass'n, Inc.,* 484 U.S. 383 (1988) ..................................... 23

*Wernsing v. Thompson*, 423 F.3d 732 (7th Cir. 2005) ................................................ 37

*Wooley v. Maynard*, 430 U.S. 705 (1977) ................................................................... 28

## Federal Statutes and Regulations

28 U.S.C. § 1291 ............................................................................................................ 1

28 U.S.C. § 1331 ............................................................................................................ 1

**Indiana Statutes and Regulations**

Ind. Code § 21-39.5 ....................................................................................... passim

Ind. Code § 21-39.5-1 ............................................................................................ 3

Ind. Code § 21-39.5-1-3 ........................................................................................ 31

Ind. Code § 21-39.5-1-5 .......................................................................................... 4

Ind. Code § 21-39.5-2-1 ............................................................................... 2, 3, 6, 24

Ind. Code § 21-39.5-2-2 ....................................................................................... 4, 5

Ind. Code § 21-39.5-2-3 .......................................................................................... 5

Ind. Code § 21-39.5-2-4 .......................................................................................... 5

Ind. Code § 21-41-2-1 ............................................................................................. 4

**University Policies**

ACA-21 [IU] ...................................................................................................... 6, 25

ACA-33 [IU] .......................................................................................................... 6

ACA-37 [IU] ...................................................................................................... 5, 24

ACA-38 [IU] ...................................................................................................... 6, 24

Standard S-27 [Purdue] ....................................................................................... 6, 25

Standard S-4 [Purdue] ......................................................................................... 7, 25

## Jurisdictional Statement

The district court had original jurisdiction of this case pursuant to 28 U.S.C. § 1331. The district court's federal-question jurisdiction was based on an alleged violation of the First Amendment by defendants.

This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291 since this is an appeal following the Final Judgment of the district court entered on July 23, 2025 (Short Appendix ["S.A."] at 1). No motion for a new trial or for alteration of the judgment or any other motion that tolls the time within which to appeal was filed in this matter. The Notice of Appeal was filed on August 7, 2025. This is not an appeal from a decision of a magistrate judge. The appellees appear in their official capacities as the Trustees of Indiana University and Purdue University. The current occupants of the offices of the Trustees of Indiana University are W. Quinn Buckner, James Bopp, Jr., Brian A. Eagle, David Hormuth, M.D., J. Timothy Morris, Marilee Springer, Sage Steele, Isaac Torres, and Isaac White. The current occupants of the offices of the Trustees of Purdue University are Lawrence "Sonny" Beck, JoAnn Brouillette, Theresa C. Carter, Vanessa J. Castagna, Malcolm S. DeKryger, Michael F. Klipsch, Reagan L. Koester, Gary J. Lehman, David A. Ricks, and Shawn A. Taylor. The State of Indiana is the intervenor-defendant. There are no prior or related appellate proceedings.

## Statement of the Issues

Indiana Senate Enrolled Act 202 (2024), codified at Indiana Code § 21-39.5 *et seq*, amends the Indiana Code concerning higher education. It mandates that

1

Indiana's public higher educational institutions, including Indiana University and Purdue University, enact policies that require their faculty to "foster a culture of free inquiry, free expression, and intellectual diversity within the institution" and to "expose students to scholarly works from a variety of political or ideological frameworks that may exist within and are applicable to the faculty member's academic discipline." Ind. Code § 21-39.5-2-1(c)(1) through (2). Faculty who violate policies passed pursuant to S.E.A. 202 may face denial of tenure, loss of tenure, and a host of other negative employment consequences through and including termination. The Trustees of Indiana University and the Trustees of Purdue University, the defendant-appellees here, have enacted and implemented those policies. The plaintiff-appellants are four professors—two at Indiana University and two at Purdue University—who have been required to significantly alter their teaching and interactions with students to comply with the demands of the S.E.A. 202 and the Universities' policies.

The issues presented in this appeal are:

a.      whether the district court erred in dismissing the Professors' complaint for lack of subject-matter jurisdiction, given that it found that the Professors' speech is chilled, and given that the Professors are suffering concrete injury from operation of S.E.A. 202 and the Universities' policies, and will continue to be injured so long as the Act and the policies are in effect;

b.      whether the Professors have a likelihood of success in their claims that

that the Act and Universities' policies violate their First Amendment

right to academic freedom; and

c.    whether the other requirements for the issuance of preliminary

injunctive relief are met.

## Statement of the Case

I.    Statement of the facts[1]

A.    The challenged statute and the Universities' policies

Senate Enrolled Act 202 ("S.E.A. 202" or "the Act") amends the Indiana Code concerning higher education.  Section 11 of the Act creates a new statutory article, codified at Indiana Code § 21-39.5 *et seq.*, entitled "State Educational Institutions: The Protection of Free Inquiry, Free Expression, and Intellectual Diversity."  The statutory prohibitions and requirements imposed by this article apply to state public higher educational institutions, including Purdue University ("Purdue") and Indiana University ("IU") and their Boards of Trustees (collectively "the Universities").  Ind. Code § 21-39.5-1.  The portion of the Act codified at Indiana Code § 21-39.5-2-1(c)(1) through (2) provides, in relevant part:

> [E]ach board of trustees of an institution shall establish a policy that
> provides that a faculty member may not be granted tenure or a
> promotion by the institution if, based on past performance or other
> determination by the board of trustees, the faculty member is:
>
>> (1) unlikely to foster a culture of free inquiry, free expression, and
>> intellectual diversity within the institution; [or]

---

[1]    The Professors cite the district court's articulation of the facts, in addition to the record citation, where applicable.

3

> (2) unlikely to expose students to scholarly works from a variety
> of political or ideological frameworks that may exist within and
> are applicable to the faculty member's academic discipline.

The statutory terms "free inquiry" and "free expression" are not defined, either in this provision or elsewhere in the Code. The term "intellectual diversity" is defined as "multiple, divergent, and varied scholarly perspectives on an extensive range of public policy issues." Ind. Code § 21-39.5-1-5. The Act provides no further elaboration on its requirement that students be exposed to works "from a variety of political or ideological frameworks."

The portion of the Act codified at Indiana Code § 21-39.5-2-2(a) further provides, in relevant part:

> Not later than five (5) years after the date that a faculty member is granted tenure by an institution and not later than every five (5) years thereafter, the board of trustees of an institution shall review and determine whether the faculty member has met the following criteria:
>
> (1) Helped the institution foster a culture of free inquiry, free expression, and intellectual diversity within the institution.
>
> (2) Introduced students to scholarly works from a variety of political or ideological frameworks that may exist within the curricula established by the:
>
>> (A) board of trustees of the institution under IC § 21-41-2-1(b); or
>>
>> (B) faculty of the institution acting under authority delegated by the board of trustees of the institution.
>
> (3) While performing teaching duties within the scope of the faculty member's employment, refrained from subjecting students to views and opinions concerning matters not related to the faculty member's academic discipline or assigned course of instruction.
>
> (4) Adequately performed academic duties and obligations.
>
> (5) Met any other criteria established by the board of trustees.

4

The Act requires each institution to "adopt a policy that establishes disciplinary actions, including (1) termination; (2) demotion; (3) salary reduction; (4) other disciplinary action as determined by the institution; or (5) any combination of subdivisions (1) through (4)" that "the institution will take if the board of trustees determines in a review conducted under subsection (a) that a tenured faculty member has failed to meet one (1) or more of the criteria described in [Indiana Code § 21-39.5-2-2] (a)(1) through (a)(5)." Ind. Code § 21-39.5-2-2(e). An institution is also required, before "renew[ing] an employment agreement . . . with," "mak[ing] a bonus decision regarding," or "complet[ing] a review or performance assessment of a faculty member," to "give substantial consideration to the faculty member's . . . performance regarding the criteria described in [Indiana Code § 21-39.5-2-2] (a)(1) through [](a)(5) of this chapter." Ind. Code § 21-39.5-2-3(b).

Each institution is required to establish and communicate a procedure by which both students and employees may submit complaints that any faculty member "is not meeting the criteria described in [Indiana Code § 21-39.5-2-2] (a)(1) through [](a)(5)." Ind. Code § 21-39.5-2-4(a)(1). If any complaints are received, the Act requires the institution to refer them to "appropriate human resource professionals and supervisors for consideration in employee reviews and tenure and promotion decisions." Ind. Code § 21-39.5-2-4(a)(3).

IU, through its Trustees, complied with the requirements of the Act by enacting or amending several policies. IU's "Faculty and Librarian Tenure" policy (ACA-37) was amended to include the following requirement: "Grants of tenure shall

5

comply with the requirements of IC 21-39.5-2-1." (S.A. at 6 [citing District Court Docket ("Dkt.") 36-1 at 7]).  Its "Faculty and Librarian Promotions" policy (ACA-38) was amended to include this provision: "All faculty promotions must comply with the requirements of IC 21-39.5-2-1." (S.A. at 6 [citing Dkt. 36-2 at 4]).  And the "Faculty and Librarian Annual Reviews" policy (ACA-21) was amended to add that the procedures used in annual reviews shall "[c]omply with the requirements of IC 21-39.5." (S.A. at 6 [citing Dkt. 36-3 at 3]).  The "Academic Appointee Responsibilities and Conduct" policy (ACA-33), which cross-references ACA-37, was also amended. (Dkt. 36-4 at 3-4).  IU also updated its complaint process, managed University-wide through a platform called "EthicsPoint," to include complaints of an S.E.A. 202 violation.  (S.A. at 9 [citing Dkt. 36-9 at 4 ¶ 19]).  These policies are binding on all IU campuses.  (Dkt. 36-5 at 2).

Purdue, via its Trustees, likewise enacted the policies required by the Act, first designated as interim versions and then in final form.[2]  Standard S-27, entitled "Intellectual Diversity, Interim" became effective on July 1, 2024. It provided:

> As a public institution in the state of Indiana, Purdue University endeavors to foster a culture of free inquiry, free expression and intellectual diversity. The University also endeavors to employ faculty, lecturers and teaching assistants who expose students to scholarly works from a variety of political or ideological frameworks within and applicable to the given academic discipline while refraining from

---

[2]     Standards S-27 and S-4 had been issued in a form designated as "interim" on the date the complaints in this matter were filed.  (*See* Dkts. 36-6, 36-7).  Those policies were amended following the conclusion of briefing but while the parties' motions were pending in the district court. They were submitted to the district court as amended evidentiary submissions.  (*See* Dkts. 49, 51).  The district court acknowledged the existence of these "final" versions, as well as the fact that their terms are "substantially the same" as the interim policies.  (*See* S.A. at 19 fn. 3).

6

subjecting students to views and opinions concerning matters not related to the discipline or assigned course of instruction.

Faculty being reviewed for tenure and/or promotion are evaluated on criteria meant to assess their likeliness to contribute to the above goals in addition to the criteria outlined in the policy on **Academic Tenure and Promotion (I.B.2)**. Faculty members awarded tenure are evaluated at least every five years thereafter on the same criteria. For non-tenured faculty and other employees and individuals assigned teaching responsibilities, the University considers the individual's contributions to the above stated goals as part of the performance review process, prior to renewing employment agreements, and prior to awarding any bonuses. Failure to meet the established criteria may result in appropriate disciplinary action up to and including termination of employment.

(S.A. at 9-10 [citing Dkt. 36-6 at 1-2]) (formatting in original). Standard S-4, "Performance Reviews for Tenured, Tenure-Track, Clinical/Professional and Research Faculty, Interim," provided that, "[i]n accordance with Indiana law," annual assessments "will include consideration of" whether the professor has "exposed students to scholarly works from a variety of political or ideological frameworks that may be within and applicable to the given academic discipline." (S.A. at 10 [citing Dkt. 36-7 at 4]). And, in a document entitled "Operating Procedures for Complaints Related to Intellectual Diversity," Purdue describes the procedure to be used when filing a complaint of violation of S.E.A. 202 and its implementing policies. (S.A. at 10 [citing Dkt. 36-8 at 1]). These "interim" policies were binding on all faculty. (Dkts. 36-6 at 1; 36-7 at 2-3). Now in substantially identical "final forms," these policies are still in effect and are binding on Purdue's faculty. (Dkts. 49-1; 49-2; 51-1;51-2).

B.    The Professors and the impact of the Act on their speech[3]

1.    Professor David McDonald

David McDonald is an associate professor in the Department of Folklore and Ethnomusicology at Indiana University Bloomington. (Dkt. 36-9 at 1 ¶ 2). He has been employed by IU since 2008 and was awarded tenure in 2014. (*Id.* ¶¶ 4-5). Professor McDonald has served two terms as Chair of his department, with his second term having concluded in June of 2024. (*Id.* ¶ 3). He plans to seek promotion to full professor this year and further promotions as available. (*Id.* ¶¶ 5-6). Professor McDonald's research and courses focus on the ethnomusicology of violence, war, and social movements, and he has a specific expertise in issues relating to Israel and Palestine. (*Id.* at 2 ¶ 7). In the fall semester of the 2024/2025 academic year, he taught two courses: the undergraduate course "Soundtrack to Revolution," and a graduate seminar on ethnomusicology. (*Id.* ¶ 8). And in the spring semester, he taught the graduate course "Paradigms in Ethnomusicology" and the undergraduate course "Palestine in Pop Culture and Media." (*Id.* ¶ 9). During the 2025/2026 academic year,

---

[3]    Neither the State nor the Universities indicate whether they are mounting a "facial" or a "factual" attack regarding the Professors' standing to bring their claims. *See Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020) ("A facial attack tests whether the allegations, taken as true, support an inference that the elements of standing exist. In this way, a facial attack does not challenge the alleged facts themselves. But a factual attack does, testing the existence of jurisdictional facts underlying the allegations."). This appears to be a "factual" attack. "[A] plaintiff undergoing only a facial attack enjoys treatment of her allegations as true, but that benefit does not carry into the context of a factual challenge." *Id.* (citations omitted). "In that context, the court may consider and weigh evidence outside the pleadings to determine whether it has power to adjudicate the action." *Id.* (citations omitted). The Professors therefore cite to evidence outside the pleadings.

8

he is teaching Soundtrack to Revolution; Music and Violence; Irish Music and Culture; and Fieldwork Methods. (*Id.* ¶ 10).

Professor McDonald's area of expertise and teaching include issues of great public interest, such as the war in Gaza, that some people deem to be controversial. Well-known "divergent" scholarly perspectives and alternative "political [and] ideological frameworks exist" regarding those issues, though Professor McDonald does not want to teach them. (*Id.* at 5 ¶ 22). As but one example, he does not believe that he should be required to teach certain "divergent" scholarly perspectives regarding the Israeli-Palestinian conflict, including the assertion that Palestinians do not exist and that their forcible dispossession in 1948 did not occur. (*Id.*). Yet this is precisely what S.E.A. 202 and IU's policy require of him. (*Id.*).

As a result, and to protect against the compulsion he would otherwise experience, he has made changes to the content and pedagogy of his courses. These are changes that he would not otherwise make, and he desires to teach in the way he did before S.E.A. 202 and IU's implementing policies. (*Id.* at 9 ¶ 33, 10 ¶ 39). He has drastically curtailed the number and types of readings and other course materials he uses to teach anything related to Palestinian history and culture. (S.A. at 11 [citing Dkt. 36-9 at 9 ¶ 33]). On politicized and controversial topics that he felt left him vulnerable to complaints, he has limited assigned readings to his own research publications. (Dkt. 36-9 at 9 ¶ 33). Whereas before, he would supplement course readings with oral histories, testimonials, and artistic performances, he concluded that using primary source materials that featured Palestinians speaking and

representing themselves would render him too vulnerable to complaints, sanction, demotion, or termination. (*Id.* at 9 ¶ 33). He has the same concerns regarding canonical works of Palestinian music, literature, and poetry typically included in his assigned course materials, and he has eliminated those as well. (*Id.* ¶ 34). He has avoided in-class discussion of political topics and themes, even when directly germane to the course or lesson's subject matter, and has eliminated open discussion. (S.A. at 11 [citing Dkt. 36-9 at 9 ¶ 35]). He fields questions from students on course materials but now focuses on lecture-only delivery. (Dkt. 36-9 at 9 ¶ 35). Professor McDonald chose not to integrate a study and discussion of the 2024 election as he would normally have done, absent the Act and policies. (Dkt. 36-9 at 10 ¶ 37).

In August of 2024, after the effective date of S.E.A. 202, Professor McDonald participated in a faculty panel entitled "Politics, Thought, Voice" sponsored by the Intensive First Year Seminar ("IFS") program at IU Bloomington. (*Id.* at 8 ¶ 32). He gave prepared remarks for 8 minutes and ended his talk with a 60-second video clip featuring political chants recorded at the April 25, 2024 Dunn Meadow Protest regarding the war in Gaza. (*Id.*). The next morning, he received a series of emails from the IFS Director explaining that four complaints were made that Professor McDonald's talk included an "Anti-Israel message"—two were made anonymously, one was from a student, and one was from a student's parent. (*Id.*). Those complaints were forwarded from IU's Hillel[4] to the Office of First Year Experience, citing S.E.A.

---

[4]    The IU Hillel is a "vibrant home for Jewish students" on Bloomington's campus. It aims to "foster a warm, inclusive environment where students celebrate Jewish life, explore their identities, and form lifelong friendships." *See* https://iuhillel.org/our-mission (last accessed Sept. 8, 2025).

202. (*Id.*). An initial investigation ensued that included the IU Vice President of Communications, the College of Arts and Sciences, and the Dean of Students, and pursuant to which Professor McDonald submitted a written copy of his remarks. (*Id.*). Several of the emails regarding the complaint sent to him by IU officials clearly reference S.E.A. 202. (*Id.*). He was never provided access to these deliberations or the result of the investigation, and he has heard nothing since. (*Id.*).

>  2.    Professor James Scheurich

James Scheurich is a Chancellor's Professor in the School of Education at Indiana University Indianapolis (formerly IUPUI). (Dkt. 36-10 at 1 ¶¶ 2). He was originally awarded tenure in approximately 1999 while a professor at the University of Texas, Austin. (*Id.* ¶ 4). He has been employed by IU Indianapolis since 2012, when he was hired with tenure, and he would like to remain in his position at IU Indianapolis. (*Id.* ¶¶ 3-4, 6). Professor Scheurich is also the Coordinator of the Urban Education Studies program, where he oversees the program's more than 70 doctoral students. (*Id.* ¶ 7). His research and courses focus on issues relating to race, class, gender, sexuality, and disabilities in the educational system and society. (*Id.* at 2 ¶ 8). During the fall semester of the 2024/2025 academic year, he taught two doctoral courses: Issues in Urban Education and Advanced Qualitative Inquiry. (*Id.* at ¶ 9). In the spring semester, he taught Early Inquiry in Urban Education. (*Id.* ¶ 10). He will teach three doctoral courses in the 2025/2026 academic year: Advanced Qualitative Research, Institutional and Community Education Change, and Issues in Urban Education. (*Id.* ¶ 11).

11

Professor Scheurich teaches subjects with well-known "divergent" and "varied" perspectives that he would choose not to include in his courses were it not for S.E.A. 202. (Dkt. 36-10 at 5 ¶ 22-23). For example, he teaches about inequities in society and its educational systems, including the necessity of diversity and inclusion efforts, and the existence and harms of institutional racism and sexism, among many other social ills. (*Id.* ¶ 23). These are obviously issues of great public interest that some people deem to be controversial, and he supposes that, as to these issues, multiple "political [and] ideological frameworks exist." (*Id.*). Although he does not consider himself to teach "political or ideological frameworks"—he teaches what is supported by social-science research—he does not know what those statutory terms encompass. (*Id.*). He does not believe that he should be required to teach certain "divergent" perspectives regarding, for example, the impacts of institutional racism or that diversity, equity, and inclusion efforts do not have a rightful place in building educational environments and systems. (*Id.*). Yet this is precisely what S.E.A. 202 and IU's policies require that he do. (*Id.*).

In an attempt to comply with the Act and IU policies, in the fall semester of the 2024-25 school year, he added one book to a doctoral seminar he teaches on the history of the U.S. as related to inequities and injustices in education and society. (*Id.* at 10 ¶ 34). He views that work as bad scholarship, to the extent that he even agrees with characterizing it as scholarship, but he added it to the syllabus because it was among the least awful examples he could imagine that presents what he would characterize as an anti-diversity point of view. (*Id.*). He made very clear to his

students that he believes the work to be offensive and unsupported by research. (*Id.*). It was not well received by the students, and Professor Scheurich does not believe that reading it or discussing it was the best use of their time or talents. (*Id.*). He disliked the experience so much that he has not added that work again to his syllabus, which itself may ultimately leave him open to adverse employment consequences. (*Id.*). He also generally feels constricted as to what he is comfortable sharing in class, such as speaking about issues such as racism or sexism, even when they are the direct subjects of study in the course, and even if his statements are fully supported in the social science literature. (S.A. at 11 [citing Dkt. 36-10 at 10 ¶ 35]).

### 3.    Professor Steven Alan Carr

Steven Alan Carr is a Professor of Communication and the Graduate Program Director of the Department of Communication at Purdue University Fort Wayne ("PFW"). (Dkt. 36-11 at 1 ¶ 2). He has been employed by PFW since 1994 and was awarded tenure in 2000. (*Id.* ¶¶ 3-4). He was promoted to full professorship in 2016. (*Id.* ¶ 4). He also serves as the Director of the Institute for Holocaust and Genocide Studies at PFW, the first and only academic center in Indiana devoted exclusively to the study of the Holocaust and other genocides. (*Id.* ¶ 6).

In his role as a professor in the Communication Department, he teaches courses in media and cultural studies. (*Id.* at 2 ¶ 7). As the Graduate Program Director of his department, he advises approximately 20 graduate students on everything from admission to the completion of their final degree requirements. (*Id.* ¶ 8). As the director of the Institute for Holocaust and Genocide Studies, he enacts

the Institute's mission, including supporting and promoting teaching and research about the Holocaust and other genocides, and promoting public engagement in global genocide prevention efforts. (*Id.* ¶ 9). During the fall semester of the 2024/2025 academic year, he taught two classes: Women, Men, and Media and Introduction to Graduate Studies in Communication. (*Id.* ¶ 10). In the spring semester, he taught Documentary and Experimental Film and Video and Mass Media Criticism. (*Id.* ¶ 11). He is teaching Media, Culture, and Society and Introduction to Graduate Studies in Communication during the fall semester of the 2025/2026 academic year. (*Id.* ¶ 12).

Professor Carr teaches subjects with well known "divergent" and "varied" perspectives that he would otherwise choose not to teach. (Dkt. 36-11 at 4-5 ¶ 23). For example, he engages in teaching about the Holocaust through his work at the Institute for Holocaust and Genocide Studies. (*Id.* at 5 ¶ 24). "Divergent" perspectives regarding the existence and scope of the Holocaust exist, ranging from denial that the Holocaust occurred to "revisionist" accounts challenging the scope and causes of that genocide. (*Id.*). He would not teach those "perspectives" because his training and study in this area inform him that these accounts are factually incorrect. (*Id.*). However, given that there are "scholars" who adhere to these, in his opinion, fundamentally erroneous viewpoints, the Act and Purdue policies appear to require him to teach these viewpoints as otherwise, he would present only one perspective regarding that event and its implications. (*Id.*).

14

As a result, he has made a number of changes to his teaching. For example, he drastically cut back readings in his fall semester graduate class to focus more on the mechanics of student writing and less on substantive content. (S.A. at 11 [citing Dkt. 36-11 at 8 ¶ 35]). This allowed him to narrow the content to that which he believed presented fewer possible challenges regarding the variety of views expressed or the "intellectual diversity" reflected in the material. (*Id.*). He also omitted assigned readings that a student could potentially view or challenge as one-sided, even though these readings are exemplars of Communication scholarship, and this left class time devoted mostly to general discussion of the discipline and the process of writing a literature review. (S.A. at 11 [citing Dkt. 36-11 at 8-9 ¶ 35]). Professor Carr chose not to integrate a study and discussion of the 2024 election as he would normally have done, absent the Act and policies. (Dkt. 36-11 at 9 ¶ 36).

In his spring classes, he omitted clips of classic films that he otherwise would have shown. (*Id.* at 9 ¶ 37). Because of the Act and Policies' various requirements, he no longer feels able to use these clips because he cannot cabin them to the limited use for which they are intended in his previous semesters. (*Id.*). For example, he no longer shows clips from the American Film Institute's seventh greatest film of all time, *Lawrence of Arabia* (1962). (*Id.*). In the past, he used that film to illustrate editing and widescreen cinematography. (*Id.*). Like all film, *Lawrence of Arabia* comes very much from its culture and time, and it features problematic depictions of Arabs and Arab culture. (*Id.*). While Professor Carr views discussion of problematic cultural depictions to be valuable in a general sense, he is constrained by the realities

15

of 50 or 75 minutes per class meeting. (*Id.* at 9-10 ¶ 37). Before engaging in any such discussions, he must have time to develop student competencies and media literacy with the basic tools and terminology of visual analysis. (*Id.* at 10 ¶ 37). Before S.E.A. 202, and Purdue's implementing policies, he had control over how and when he brought up such issues in a manner that fit his substantive and pedagogical goals. (*Id.*). But now, whether viewed as a matter of intellectual diversity, scholarly perspectives, free inquiry, or free expression, the Act and policies have freighted every class meeting with those specific requirements. (*Id.*). He has had to change his approach to meet this new reality. (*Id.*).

4.     Professor David F. Schuster

David F. Schuster is an associate professor in the Department of History at PFW. (Dkt. 36-12 at 1 ¶ 2). He has been employed by PFW since 2006 and was awarded tenure in 2012. (*Id.* ¶¶ 3-4). Professor Schuster is working toward promotion to full professorship within the next several years. (*Id.* ¶ 4). He plans to remain in his position and to seek promotion as available at PFW. (*Id.* ¶ 5). His research and courses focus on U.S. history. (*Id.* ¶ 6). He taught the following courses during the fall semester of the 2024/2025 academic year: American History I, American History II and U.S. History since World War II. (*Id.* ¶ 6). And he taught the following courses during the spring semester: American History II, Historically Speaking: Intro to Historical Communication, and Senior Seminar: Local History. (*Id.* at 2 ¶ 7). He will teach the following courses during the 2025/2026 academic year: American History I; American History II; History of American Medicine; The 1960s; Historically

Speaking: Introduction to History Communications; and The Gilded Age and Progressive Era. (*Id.* ¶ 8).

Professor Schuster teaches plenty of subjects with well known "divergent" and "varied" perspectives that he would not present to students, but for the application of S.E.A. 202 and Purdue's implementing policies. (Dkt. 36-12 at 4 ¶ 19).  For example, he teaches about the "culture wars" surrounding the LGBTQ rights movement in the 1990s, and he is aware that some academics teach about this movement as embodying the rise of a "homosexual agenda," during which, according to them, LGBTQ people were attempting to indoctrinate students and others with ideas about homosexuality. (*Id.* at 4-5 ¶ 20).  He also teaches about slavery and its legacy, and he does not believe he should be required to teach any number of the "divergent" scholarly perspectives regarding those topics, including the perspective that was once dominant in this field—with which he strongly disagrees—that slavery benefitted African American people.  (*Id.* at 5 ¶ 21).  In the past, when he has taught about, for example, the pro-slavery "Dunning" school of thought, it was to specifically cite it as an example of how historiography changes over time; his approach was to identify it not as a divergent perspective, but a wrong perspective.  (*Id.*).  However, the idea that slavery benefitted enslaved people is now being taught as a mainstream idea in, for example, Florida's schools.  (*Id.*).

To comply with the Act and Purdue's policies, he made changes to his 2024/2025 courses—changes that he would not have otherwise made.  (*Id.* at 8 ¶ 31). For example, he used to begin each class with a brief discussion of current events—

an exercise that was germane to the subject matter of his courses and that had multiple pedagogical purposes. (S.A. at 11 [citing Dkt. 36-12 at 8 ¶ 32]). It helped to create a sense of cohesiveness among the students, and it helped them make connections between historical events—however distant—and current events, which is a primary goal of any history course. (*Id.*). These connections are much more likely to happen when the students have discussed current events throughout the semester, and when necessary, Professor Schuster could refer back to them to guide the students to draw those connections. (*Id.*). He no longer does so. (*Id.* at 8 ¶ 33). Because current events are often fraught with moral, political, or religious import, this sort of free-flowing discussion poses tremendous risk under the Act and Purdue's policies. (*Id.* at 8-9 ¶ 33). If a student feels unheard, dismissed, or targeted because of their viewpoint, Professor Schuster may be held responsible for failing to create— for them—the requisite "culture" and therefore become a subject of complaint. (*Id.).* He is also now unwilling to share his opinions regarding controversial topics that are the subject of course discussion, such as whether the United States was justified in dropping the atomic bomb on Japan during World War II, or whether reparations are due African Americans. (S.A. at 11 [citing Dkt. 36-12 at 9 ¶ 35]). Although in the past he was willing to share and discuss his views, now he is choosing not to do so. (S.A. at 11 [citing Dkt. 36-12 at 9 ¶ 35]). Professor Schuster has also largely suspended the "marketplace of ideas" approach he previously employed in the classroom. (Dkt. 36-12 at 10 ¶ 36).

18

C.    The Professors exercise their academic freedom in determining the content and pedagogy of their courses

When the Professors enter their classrooms, they have specific learning objectives for their students, and the content and pedagogies of the courses are designed to achieve those goals. (Dkts. 36-9 at 7 ¶ 28; 36-10 at 9 ¶ 32-33; 36-11 at 7-8 ¶ 31; 36-12 at 7 ¶ 27). The objectives are driven as much or more by the desire to increase their students' intellectual facility than by any aspiration to impart specific facts or knowledge. (*Id.*). Setting these goals is at the core of their academic freedom to determine the content and pedagogy of their instruction. (Dkts. 36-9 at 7 ¶¶ 28-29; 36-10 at 9 ¶ 33; 36-11 at 7-8 ¶¶ 31-32; 36-12 at 7 ¶¶ 27-28).

The Professors also seek to implement their own individual conceptions of free inquiry and free expression within their classrooms, insofar as they believe that the most effective teaching and learning occurs when all students feel welcome and able to express their comments and pose their questions in a supportive environment. (Dkts. 36-9 at 6-7 ¶ 26; 36-10 at 8 ¶ 30; 36-11 at 7 ¶ 29; 36-12 at 6-7 ¶ 25). This does not mean, however, that the Professors believe it is appropriate to provide time or attention to all topics, lines of questioning, or commentary—however relevant they may be. (Dkts. 36-9 at 7 ¶ 27; 36-10 at 9 ¶ 31; 36-11 at 7 ¶ 30; 36-12 at 7 ¶ 26). They exercise their judgment and academic freedom to determine when discussion or inquiry is not desirable or appropriate. (*Id.*).  All of the Professors believe that the changes they have made in their curricula and pedagogies have been to the detriment of their students.  (Dkts. 36-9 at 10 ¶ 39; 36-10 at 9 ¶ 33, 10 ¶ 34; 36-11 at 10 ¶ 38; 36-12 at 9 ¶ 34).  And all of the Professors have heard these and other concerns echoed

19

by other colleagues within their institutions.  (Dkts. 36-9 at 10-11 ¶ 40; 36-10 at 11 ¶ 38; 36-11 at 10 ¶ 40; 36-12 at 10 ¶ 38).

II.　Procedural history

The Professors previously filed a lawsuit in the district court challenging the constitutionality of S.E.A. 202.  *Carr et al. v. Trustees of Purdue University, et al. No.* 1:24-cv-772-SEB-MJD (S.D. Ind.).  That complaint was dismissed without prejudice for lack of subject-matter jurisdiction, on the basis that at the time the plaintiffs filed their complaint, the Universities had not yet promulgated the policies mandated by the Act.  *See Carr et al. v. Trsts. of Purdue Univ. et al.*, 2024 WL 3819424 (S.D. Ind. 2024).  The plaintiffs did not appeal that dismissal.

On September 13, 2024, Professors David McDonald and James Scheurich filed their "Complaint for Declaratory and Injunctive Relief / Notice of Challenge to the Constitutionality of an Indiana Statute" against the Trustees of Indiana University. (Dkt. 1).  On the same date, Professors Steven Alan Carr and David F. Schuster filed their "Complaint for Declaratory and Injunctive Relief / Notice of Challenge to the Constitutionality of an Indiana Statute" against the Trustees of Purdue University. (*Carr et al. v. Trustees of Purdue University*, 1:24-cv-1578-JRS-TAB, Dkt. 1).  On September 27, 2024, the Professors filed their Motions for Preliminary Injunction. (Dkt. 12; *Carr* Dkt. 14).  On September 27, 2024, the State of Indiana sought to intervene in both cases to defend the constitutionality of Indiana Code § 21-39.5, which the Professors did not oppose.  (Dkt. 14; *Carr* Dkt. 18).  On October 15, 2024, the parties filed a joint motion to consolidate *McDonald* and *Carr* (Dkt. 22; *Carr* Dkt.

27), which the district court granted on October 28, 2024 (Dkt. 23; *Carr* Dkt. 28).[5] On June 4, 2025, the district court granted the State's motion to intervene. (Dkt. 50).

On March 26, 2025, the State and the Universities each filed a motion to dismiss the Professors' complaint for lack of subject-matter jurisdiction. (Dkts. 40, 42).

On July 23, 2025, the district court issued its "Entry on the University Defendants' and the Intervenor State of Indiana's Motions to Dismiss and Plaintiffs' Motion for Preliminary Injunction." (S.A. at 3). The district court concluded that, although the Professors were changing their speech as a direct result of the challenged policies, the Professors lacked standing to bring their claims and that their claims were not ripe. (S.A. at 14-21). Accordingly, the district court dismissed the Professors' complaint and denied their motion for preliminary injunction without reaching the merits of the Professors' claims. (S.A. at 1).

## Summary of the Argument

Although the district court agreed that the Professors are altering their curricula and pedagogies—and that their speech is being chilled based on an actual fear of enforcement—it concluded that the Professors lacked standing to bring their claims. It did so based on one conclusion: that the Professors' fear of enforcement was not well founded. According to the district court, because the Universities are still developing campus and department-level policies to implement the Act, the Professors' fears of enforcement of the university-level policies challenged here

---

[5]    Following consolidation, the *Carr* cause number was closed. (*Carr* Dkt. 28).

cannot be said to be objectively well-founded. This conclusion is erroneous, and the Professors have standing to bring their claims, which are ripe.

"To satisfy the injury-in-fact requirement in a pre-enforcement challenge, the plaintiff must show only that she faces a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 473-74 (7th Cir. 2012) (citations omitted). Self-censorship is a "harm that can be realized even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n, Inc.,* 484 U.S. 383, 393 (1988). At no point have the Universities contended that they will not enforce their policies (which implement the specific requirements of the Act) against the Professors. The Professors have altered and continue to alter the readings they assign and discuss, they have changed and continue to change the content they present, and they have modified and continue to modify the format of their courses. These facts are not disputed, and there can be no question that the Professors' speech is both chilled and compelled by the Act and the policies. There is no doubt that the Professors' intended course of conduct—teaching their courses as they desire and would otherwise do—is affected by constitutional interests and has been infringed here.

Because the district court determined that it lacked subject-matter jurisdiction over this matter, it did not consider the merits of the Professors' motion for preliminary injunction. This Court may certainly do so in lieu of remand, given that the record is developed and this issue presents a pure question of law. Following this Court's recent decision in *Kilborn v. Amiridis*, 131 F.4th 550 (7th Cir. 2025), there

can be no doubt that the Professors have a protected First Amendment interest, based on their academic freedom, in the speech that is being both chilled and compelled by the Act and the implementing policies enacted by the Universities. Neither the Universities nor the intervenor State can show an interest in these speech restrictions, let alone an interest sufficient to satisfy the heightened scrutiny that applies to this type of prior restraint of speech. The Professors are likely to succeed on the merits of their claim that the Act and policies violate their First Amendment rights. As all of the requirements of a preliminary injunction are met, one should issue enjoining enforcement of the Act and the Universities' implementing policies.

## Argument

I.   Standard of review

This Court reviews de novo a dismissal for lack of Article III standing. *Nowlin v. Pritzker*, 34 F.4th 629, 632 (7th Cir. 2022) (citation omitted).

The denial of a preliminary injunction is reviewed for abuse of discretion. *Lukaszczyk v. Cook Cnty.*, 47 F.4th 587, 598 (7th Cir. 2022) (citation omitted). "A district court abuses its discretion when it commits a clear error of fact or an error of law." *Id.* (quotation and citations omitted). Legal conclusions are considered de novo and findings of fact are reviewed for clear error. *Id.* (citation omitted).

II.  The Professors have standing to bring their claims, which are ripe, and the dismissal of their claims was erroneous

For a claim to be justiciable in federal court, a plaintiff "must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury." *Uzuegbunam v.*

*Preczewski*, 592 U.S. 279, 285 (2021) (citations omitted).  The associated ripeness doctrine "is meant to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *T.H.E. Ins. Co. v. Olson*, 51 F.4th 264, 270 (7th Cir. 2022) (citation omitted).  "Whether an issue is ripe depends on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.  An issue is more likely to be fit for judicial review if it is purely legal rather than factual."  *Id.* (quotation and citation omitted).[6]

A.    The Universities have implemented the policies required by the Act, and these policies are in effect and apply to the Professors

S.E.A. 202 requires the Universities to implement polices that carry out its terms.  Those challenged policies, duly enacted by the Universities, are currently in effect, apply to the Professors, and impose duties and obligations on them.  The facts demonstrated in support of their preliminary-injunction motion, and unchallenged by the Universities or the State, are more than sufficient to establish the Professors' standing to raise their claims, which are ripe, and this should be the beginning and the end of the standing inquiry.

As the Professors have already detailed, Indiana University chose to implement the Act's requirements simply by incorporating the terms of the statute into formal policies: grants of tenure "shall comply with the requirements of IC 21-39.5-2-1" (Dkt. 36-1 at 7 [ACA-37]); faculty promotions "must comply with the requirements of IC 21-39.5-2-1" (Dkt. 36-2 at 4 [ACA-38]); and the procedures used

---

[6]    As the district court's determination as to ripeness was coextensive with its findings on the Professors' standing, these doctrines are treated together.

in faculty reviews shall "comply with the requirements of IC 21-39.5" (Dkt. 36-3 at 3 [ACA-21]).  Purdue University accomplished this using different verbiage, and it enacted policies (both the "interim" and "final") that restate the requirements of the Act.  (Dkts. 36-6 at 1-2, 49-1, 49-2 [Standard S-27]); Dkts. 36-7 at 1, 4, 51-1, 51-2 [Standard S-4]).  These policies have been in effect throughout this litigation and apply with full force.

      B.    The Professors' speech is both compelled and chilled by the Act and university policies

Everyone agrees that none of the Professors has been disciplined for violating S.E.A. 202 or a university policy.  But "[a] plaintiff "does not have to await the consummation of threatened injury to obtain preventive relief."  *Ctr. for Individual Freedom,* 697 F.3d at   473 (citations omitted).  "To satisfy the injury-in-fact requirement in a pre-enforcement challenge, the plaintiff must show only that she faces a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Id.*

The district court concluded, and certainly the Professors have established, that their speech is being chilled.  (S.A. at 16).  "The injury-in-fact standard is often satisfied in pre-enforcement challenges to limitations on speech. The Supreme Court has recognized self-censorship as a distinct harm that can be realized even without an actual prosecution." *Id.*, 697 F.3d at 473-74.  The Professors "may show standing for a pre-enforcement First Amendment challenge to a law when they resort to self-censorship out of an actual and well-founded fear that the law will be enforced against them."  *Brown v. Kemp*, 86 F.4th 745, 767 (7th Cir. 2023) (quotation and citation

omitted).  The Professors have just as concretely established that they are engaging in compelled speech due to operation of the Act and policies.  That is simply the flip side of the same First Amendment coin.  *See, e.g.*, *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ("The right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'").

"To show standing, plaintiffs are not required to show that they will win on the merits of their constitutional claims. To suffice for standing, and to avoid confusing standing with the merits, plaintiffs' intended course of conduct need only be arguably affected by constitutional interests, and arguably proscribed by the challenged statute." *Brown*, 86 F.4th at 761-62.  The Professors have altered and continue to alter the readings they assign and discuss (Dkts. 36-9 at 8-9; 36-10 at 10; 36-11 at 8-9), they have changed and continue to change the content they present (Dkts. 36-9 at 9-10; 36-11 at 8-9; 36-12 at 8-10), and they have modified and continue to modify the format of their courses (Dkts. 36-9 at 9-10; 36-11 at 8-10; 36-12 at 8-10).  These facts are not disputed, and there can be no question that the Professors' speech is both chilled and compelled by the Act and the policies.  There is no doubt that the Professors' intended course of conduct—teaching their courses as they desire and would otherwise do—is affected by constitutional interests.  They have a First Amendment right to exercise their academic freedom.  And they have made the required showing that the statute "arguably" proscribes their protected speech.

C.     The Professors' fear of enforcement is well-founded

Although the district court agreed that the Professors are altering their speech due to the Act and policies, the district court concluded that they lack standing to raise their claims because at the time these lawsuits were filed, the "policies were nothing more than preliminary and interim measures, with policymaking and implementation still ongoing." (S.A. at 16-18). The district court interpreted this "ongoing" policymaking as evidence that, right now, there was no credible threat of enforcement. (S.A. at 16-18). This was error.

While IU's policies have never been designated as "interim," the district court nonetheless found those policies to be "preliminary" and "interim" based on the IU Professors' descriptions of ongoing efforts to establish additional campus and department-level policies and guidance related to S.E.A. 202 compliance. (S.A. at 16-17). Certainly, the Professors do not dispute that these efforts are ongoing; they are simply irrelevant to the question of standing. None of these lower-level policies or guidance can contradict or supersede the university-level policies that were in effect at the time the plaintiffs filed their suit, and that remain in effect today. Moreover, and most importantly, the policies simply restate and implement the Act. There is nothing inchoate about these policies. But in any event, this is not an issue of standing. The fact that the policies may be added to, or may later change, has nothing to do with the injuries the Professors are suffering today.[7]

---

[7]     The district court concluded that the complaints filed against Professor McDonald do not "reflect a credible threat" that IU will enforce its policies against Professor McDonald, not only because it characterized the policies as "interim" but also because no discipline has yet been imposed upon Professor McDonald as a result of those complaints. But again—this

27

The same is true of Purdue's policies, though they were still designated as "interim" when the Professors filed suit.[8]  Purdue has provided no indication that there exists any difference in application between a policy labeled as "interim" and any other policy.  The "interim" policies, when they were in effect, specifically governed the professors' activities, and the professors would have been subject to the possible negative employment consequences upon violation.  And, of course, even final policies may be amended by the Trustees.  Professors Carr and Schuster testified, similarly to Professors McDonald and Scheurich, that efforts to develop further campus and department-level guidance and policies remained ongoing.  (*See* S.A. at 17-18 [citing Dkts. 41-7, 41-9]).  But again, these policies may only complement the university-wide policies already adopted by Purdue.  They are irrelevant for purposes of standing. The district court's holding amounts to a conclusion that persons must accede to a violation of their First Amendment rights for an unspecified period of time simply because future policies might be more permissive to these rights.

The district court concluded that the Professors' self-censorship, "without more" does not satisfy the injury-in-fact requirement of standing and cited the proposition that a plaintiff cannot "manufacture standing by inflicting harm on

---

is asking too much of standing.  (S.A. at 18-19).  If nothing else, the process Professor McDonald went through shows that the policies *are* in effect, result in action by the University when complaints are received, and therefore inevitably result in precisely the chill the Professors have described.

[8]     For purposes of standing, the Professors rely on the "interim" policies that were in effect at the time their complaint was filed.  (Dkts. 36-6, 36-7).  However, the fact that substance of the "final" versions of the policies is materially identical to the interim ones (Dkts. 49-2, 51-2), belies any argument that their interim nature impacts whether the Professors' fears of enforcement were well-founded.

themselves based on their fears of hypothetical future harm that is not certainly impending." (S.A. at 20) (citations omitted). But chill is *always* self-inflicted and has already been realized. The only question is whether the Professors are justified in altering their speech because their "impacted course of conduct" is "at least arguably proscribed by the challenged statute." Certainly it is, and the Professors have standing to challenge the Act and the Universities' implementing policies.

III.   The Professors are entitled to a preliminary injunction enjoining the operation of the challenged Act and university policies against them

Because the district court concluded it lacked subject-matter jurisdiction over the Professors' claims, it denied the Professors' motion for preliminary injunction without further analysis. (*See* S.A. at 21). Should this Court determine the Professors have standing to bring their claims, it can certainly proceed to a determination of the preliminary injunction motion. *See Ambrosia Land Invs., LLC v. Peabody Coal Co.*, 521 F.3d 778, 786 (7th Cir. 2008) ("We may decide the merits of legal issues which were not addressed by the district court only when the facts on which those conclusions are based are not in dispute.").

There are no disputes regarding the relevant facts, and the issue to be resolved is purely a legal question.

A.   Legal standard

A court must weigh several factors in the preliminary injunction determination:

(1) whether the plaintiffs have established a prima facie case, thus demonstrating at least a reasonable likelihood of success at trial;

(2) whether the plaintiffs' remedies at law are inadequate, thus causing

29

irreparable harm pending the resolution of the substantive action if
the injunction does not issue;

(3) whether the threatened injury to the plaintiffs outweighs the
threatened harm the grant of the injunction may inflict on the
defendant; and

(4) whether, by the grant of the preliminary injunction, the public
interest would be disserved.

*See, e.g.*, *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987).

The heart of this test, however, is "a comparison of the likelihood, and the gravity, of

two types of error: erroneously granting a preliminary injunction, and erroneously

denying it." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th

Cir. 1984). Thus, "the more likely [the movant] is to win, the less the balance of harms

must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir.

2015).

    B.    The Professors are likely to succeed in their claims that the Act and the
university policies violate their First Amendment right to academic
freedom[9]

        1.    The First Amendment protects the Professors' speech, and the Act
and university policies impinge upon the Professors' protected
expression

While this case was being briefed in the district court, this Court definitively

held, echoing the unanimity of circuits, that a professor's speech "involving university

teaching and scholarship" is his own speech, not the government's, and therefore the

---

[9]    The Universities chose not to respond to the Professors' arguments in support of their
motion for preliminary injunction. (Dkt. 43 at 24-25). The Universities have therefore
waived any such argument on appeal. *Lane v. Structural Iron Workers Loc. No. 1 Pension
Tr. Fund*, 74 F.4th 445, 450 (7th Cir. 2023) ("It is a cardinal rule of appellate practice that
we ignore arguments not presented below.").

First Amendment is implicated. *Kilborn,* 131 F.4th at 558. After reviewing the history of the academic freedom doctrine and the possible impact of *Garcetti v. Ceballos*, 547 U.S. 410 (2006), which held that the official speech of most government employees does not implicate the First Amendment, this Court's conclusion was straightforward: "[w]e decline the University officials' invitation to extend *Garcetti* to speech involving university teaching and scholarship when the Supreme Court was unwilling to do so. Nor are we alone. Every other circuit to decide the issue has recognized that *Garcetti* does not apply to university teaching or scholarship." *Kilborn,* 131 F.4th at 558 (citing *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550 (4th Cir. 2011); *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014); *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021); *Heim v. Daniel*, 81 F.4th 212 (2d Cir. 2023)).

There can be no question that the rule articulated in *Kilborn* applies here. The challenged Act and policies undoubtedly regulate the Professors' academic speech. The challenged statutory provisions apply only to faculty members and academic appointees—*i.e.*, those university employees whose "employment duties include teaching students." Ind. Code § 21-39.5-1-3. The Act and the policies explicitly regulate the Professors' instructional methods, curricula, and interactions with students that are within their employment duties. The Act and policies require the Professors to "expose students to scholarly works from a variety of political or ideological frameworks," that may exist within their disciplines. (Dkts. 36-1 – 36-7). And while the requirement that they "foster" in their institutions "a culture of free inquiry, free expression, and intellectual diversity" is not *limited* to their teaching

activities, clearly it encompasses them: otherwise it would be nonsensical to tether their tenure, promotions, and continued employment to them having done so. The Professors' academic speech is protected by the First Amendment and is the subject of the challenged statutory and policy provisions.

Given that the First Amendment protects the Professors' freedom to direct the content and pedagogy of their instruction, it is a small task to demonstrate that the Act and university policies impinge upon that right. As described above, the Professors have all been impacted by the Act and policies and have changed—and continue to change—their instruction as a result. They have been required to alter the readings they assign and discuss (Dkts. 36-9 at 9; 36-10 at 10; 36-11 at 8-9), change the content they present (Dkts. 36-9 at 9-10; 36-11 at 8-9; 36-12 at 8-10), and modify the format of their courses (Dkts. 36-9 at 9-10; 36-11 at 8-10; 36-12 at 8-10). And all of this has been done only because of the operation of the Act and policies. (Dkts. 36-9 at 9 ¶ 33; 36-10 at 10 ¶ 34; 36-11 at 10 ¶ 39; 36-12 at 8 ¶ 31). The impact on their protected expression is clear: the Act and the implementing policies explicitly regulate the Professors' teaching and curricular activities, and there can be no doubt that their protected First Amendment right to academic freedom has been directly impacted. The sole question is whether that violates the Constitution.

2.    Heightened scrutiny applies to evaluate prior restraints on government-employee speech

The First Amendment's speech protections are not absolute, and the Supreme Court has long recognized that the government may impose some limitations on

speech when acting as employer, even where such restrictions could not be lawfully applied to members of the general public.

Many, if not most, cases involving employee speech arise in the context of employment actions taken as a result of speech that has already occurred. As to these *post hoc* employment decisions, the familiar balancing framework established by *Pickering* and *Connick* governs. *See Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968), *Connick v. Myers*, 461 U.S. 138 (1983). The task of a reviewing court "is to seek 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Connick*, 461 U.S. at 142 (quoting *Pickering*, 391 U.S. at 568).

But the Act and university policies do more than allow for *post hoc* punishment for speech; they constitute the regulation of speech before it occurs—a prior restraint, which is the most disfavored of speech restrictions. *See, e.g., McCarthy v. Fuller*, 810 F.3d 456, 461 (7th Cir. 2015)*; United States v. Kaun*, 827 F.2d 1144, 1150 (7th Cir. 1987). They are therefore subject to a form of heightened scrutiny established by the Supreme Court in *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) ("*NTEU*"). As this Court has highlighted, "when imposing a prior restraint on employee speech, the government has a greater burden than when it is making an isolated employment decision." *Crue v. Aiken*, 370 F.3d 668, 678 (7th Cir. 2004). "With a prior restraint, the impact is more widespread than any single supervisory

decision would be, and the action chills potential speech instead of merely punishing actual speech already communicated." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 750 (7th Cir. 1999) (citing *NTEU*, 513 U.S. at 468).

"It is therefore well settled that the government's prospective restriction of future speech is approached with a greater presumption of unconstitutionality than post-hoc disciplinary actions against specific employees for speech already uttered." *Wernsing v. Thompson*, 423 F.3d 732, 747 (7th Cir. 2005). To justify such a prospective regulation, the government must show that "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expressions' 'necessary impact on the actual operation' of the Government." *Crue*, 370 F.3d at 678 (quoting *NTEU,* 513 U.S. at 468) (further citation omitted).

       3.    The State has no interest in this regulation of the Professors' speech

The Universities did not respond to the Professors' merits argument below, and they have waived their opportunity to attempt to articulate an interest justifying the restriction of the Professors' academic freedom.

The State bears the burden of articulating its interest. In its briefing below, the State did not articulate a clear interest, although it generally invoked, in parade-of-horribles fashion, the evils that would flow from "permitting individual educators to enforce whatever classroom environment they wish." (Dkt. 41 at 27). The State also asserted that it "has a heightened interest in the content of education in the

State's *public* schools, far and beyond what the State might have in a more general marketplace of ideas." (Dkt. 41 at 27).

For starters, the State's extraordinarily broad and imprecise interest formulation comes nowhere near meeting the standard required. But even accepting this formulation, *Kilborn* makes clear the outer bounds of this interest: while a State has an interest in regulating professorial speech when there is a "legitimate academic basis" for doing so—it can require that the math department offer courses teaching the Pythagorean theorem or that the history curriculum include lessons about World War II—it has no interest in preventing or compelling the teaching of "controversial views" or specific viewpoints. *Kilborn*, 131 F.4th at 561. That, however, is precisely what the Act and statutorily mandated policies, which govern every conceivable academic discipline, do. And neither the Act nor the policies have even a passing relationship with the permissible governmental interest articulated in *Kilborn*—that is, for students to "learn free of harassment." *Id.* at 561.

Equally importantly, the government "may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023) (citations omitted). "Nor does it matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include. All that offends the First Amendment just the same." *Id.* (citations omitted) While the practical impacts look different from professor to professor—they might involve the Israeli-Palestinian conflict (Dkt. 36-9 at 5), institutional racism and

efforts at diversity, equity, and inclusion (Dkt. 36-10 at 5), eugenics and race (Dkt.36-11 at 5-6), or the culture wars and the impact of slavery (Dkt. 36-12 at 4-5)—the constitutional impact is the same: the statute's affirmative mandate to engage in certain curricular activities imposes *some obligation* to speak in a particular way. It also forces the Professors to self-censor, foregoing topics altogether either when that alternative is preferable to engaging in compelled speech or simply when it is necessary to make classroom time for the "divergent" views required by the Act.

To the extent that the State's interest is in compelling the Professors to provide the State's vision of an appropriate or balanced "marketplace of ideas," the Supreme Court has recently strongly suggested that the First Amendment simply does not recognize such a governmental interest. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024). *Moody* involved state statutes that attempted to control what methods social-media platforms could use to moderate or exclude content. *Id.* As the Court summarized, "[a]t bottom, Texas's law requires the platforms to carry and promote user speech that they would rather discard or downplay. The platforms object that the law thus forces them to alter the content of their expression." *Id.* at 728. The State's attempt to control that content curation, in order to "balance" the marketplace of ideas they presented, amounted to "the government itself deciding when speech was imbalanced, and then coercing speakers to provide more of some views or less of others." *Id.* at 733. The Court indicated that "the government cannot get its way just by asserting an interest in improving, or better balancing, the marketplace of ideas," notwithstanding that "[o]f course it is critically important to have a well-functioning

sphere of expression, in which citizens have access to information from many sources. That is the whole project of the First Amendment." *Id.* at 732.  The Court concluded that, whatever measures might be appropriate "[t]he government may not, in supposed pursuit of better expressive balance, alter a private speaker's own editorial choices about the mix of speech it wants to convey." *Id.* at 734.  The academic freedom case law echoes exactly that sentiment:

> [T]he university classroom is peculiarly the marketplace of ideas. For this reason, we have recognized that the First Amendment protects the right of faculty members to engage in academic debates, pursuits, and inquiries and to discuss ideas, narratives, concepts, imagery, and opinions—scientific, political or aesthetic—with an audience whom the speaker seeks to inform, edify, or entertain.

*Kilborn*, 131 F.4th at 559 (citing *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967), *Trejo v. Shoben*, 319 F.3d 878, 884 (7th Cir. 2003) (cleaned up)) (quotations omitted).

### 4. The Professors' interest in their academic freedom outweighs the State's attempted justification of the Act

To justify this speech regulation, the State must show that "the interests of both audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expressions' 'necessary impact on the actual operation of the Government." *Crue*, 370 F.3d at 678 (quotation and citation omitted). Given the presumption of unconstitutionality of a prior restraint under *NTEU*, and the Supreme Court's "deep[] commit[ment] to safeguarding academic freedom" as "a special concern of the First Amendment," neither the State nor the Universities can establish that the Professors' interest in the content and pedagogy of their instruction is outweighed by any actual negative impact on the

operation of their universities. *Keyishian,* 385 U.S. at 603. Quite to the contrary, professors are employed "to speak, and to speak freely, guided by their own professional expertise, on subjects within their academic disciplines." *Heim v. Daniel*, 81 F.4th 212, 227 (2d Cir. 2023) (citation omitted). And "their university's 'governmental function[ ]' is to provide them a forum to do so." *Id.* (citing *Garcetti,* 547 U.S. at 419).

That is precisely the position taken publicly by Dr. Pamela Whitten, Indiana University's President, as the Act was being considered by the Indiana legislature. She expressed that Indiana University was "deeply concerned about language regarding faculty tenure that would put academic freedom at risk, weaken the intellectual rigor essential to preparing students with critical thinking skills, and damage our ability to compete for the world-class faculty who are at the core of what makes IU an extraordinary research institution." *See* Ethan Sandweiss, *IU President Whitten Comes out Against Controversial Tenure Bill*, Indiana Public Media, February 7, 2024, https://www.ipm.org/2024-02-07/iu-president-whitten-comes-out-against-controversial-tenure-bill (last accessed September 14, 2025). And, to be clear, the statute does not regulate the teaching of indisputable facts: it mandates the expression of *viewpoints* and *ideas*. This is particularly troubling in the First Amendment context.

Of course, faculty of the State's institutions of higher learning have, until this statute, exercised precisely this academic autonomy. Indiana University has been in operation since 1820 and Purdue University since 1869 without this interference. As

the undisputed evidence establishes, the Professors have all been given their universities' unequivocal stamps of approval regarding their teaching activities and interactions with students. They have all been granted tenure. (Dkt. 37 at 6-7). Professors Carr and Scheurich have attained "full professor" status—a promotion from an initial grant of tenure as an associate professor. (*Id.* at 6-7). Professor Scheurich has been named a Chancellor's Professor. (*Id.* at 6). Professor McDonald has served two terms as his department's Chairperson. (*Id.*). Indeed, it is noteworthy that, while the Universities defended against the Professors' claim on jurisdictional grounds, they have not attempted to justify their own policies—or the Act—on the merits.

Moreover, the Act's and policies' overbreadth and vagueness merely illustrate the degree to which they are not tailored at all—let alone "narrowly" so.[10] As is clear from the context of non-employee, facial challenges to statutes on the grounds of vagueness and overbreadth, "[s]tatutes can violate the First Amendment as unconstitutionally overbroad in at least two distinct ways. The first is usually referred to as vagueness." *Brown v. Kemp*, 86 F.4th at 771. "Vague laws force potential speakers to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 807 (2011) (quotation and citation omitted) (cleaned up). The same is true of

---

[10]    These constitutional defects may also form the basis for standalone claims under the First Amendment and the Due Process Clause, which were also raised in the Professors' complaint. Because vagueness and overbreadth concerns are subsumed within any analysis under *NTEU*, and because the Professors raise a facial challenge, the Professors address these claims only through the lens of *NTEU*'s balancing test.

statutes that are overbroad, which have the same chilling effect. "The part of overbreadth doctrine concerned with vagueness is 'predicated on the danger that an overly broad statute, if left in place, may cause persons whose expression is constitutionally protected to refrain from exercising their rights for fear of criminal sanctions.'" *Brown v. Kemp*, 86 F.4th at 771 (quoting *Massachusetts v. Oakes*, 491 U.S. 576, 581 (1989)). "Vagueness thus can be thought of as one form of overbreadth, describing rules that are overbroad because their effect is to chill constitutionally protected activity." *Id.*

As the Professors have described, *supra*, this statute reaches every aspect of their professorial duties—inside and outside of the classroom—as to both pedagogy and content. And there are many aspects of the statute that they either do not understand or about which they cannot discern scope and breadth. For example, how are the Professors to determine how to achieve compliance with the statute's demands? What does it mean to "expose" students to these "scholarly" works from a "variety of political and ideological frameworks"? Is it enough for them to say that there are other views but the Professors consider them incorrect, or do they have to explain those other views or assign readings that espouse those other views? Or, when it comes to "fostering the "culture[s]" of free expression and free inquiry—how are the Professors to decide which lines of questioning and discussion should or must proceed during their limited class time? How many of the "multiple, divergent, and varied scholarly perspectives" must they present to be deemed to have fostered a "culture of intellectual diversity"?

40

As they are unable to answer these questions, the Professors may be "steer[ing] far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Brown v. Ent. Merchants Ass'n*, 564 U.S. at 807 (quotation and citation omitted) (cleaned up).  Even if the State had an interest in forcing the Professors to teach certain content or in a certain way, there can be no question that this interest does not extend as far as the statute mandates, impacting all aspects of their speech activities.

The very notion of academic freedom is at odds with a statute that regulates the content and methods of professors' instruction. The State cannot meet its burden to justify this prior restraint.  The Professors are likely to succeed on the merits of their claims that the statute violates the First Amendment.

C.      The other requirements for the grant of a preliminary injunction are met

1.      Without an injunction, the Professors will suffer irreparable harm for which there is no adequate remedy at law

The Professors' First Amendment rights are being violated, and their speech is being both compelled and chilled. "[T]he loss of First Amendment freedoms, for even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citation omitted).  More generally, "a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (citations omitted). This Court has stressed that the "[t]he loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages

are not adequate." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). Money damages, aside from being barred by virtue of the Eleventh Amendment, are not sufficient to rectify the irreparable injury that the Professors are experiencing.

> 2. The balance of harms favors the Professors and the public interest will not be disserved by an injunction

This Court has held that a governmental entity cannot claim that requiring it to comply with the First Amendment is harmful or burdensome. *Christian Legal Soc'y*, 453 F.3d at 867 (holding that if a governmental entity "is applying [a] policy in a manner that violates [the plaintiffs'] First Amendment rights . . . then [the] claimed harm is no harm at all"). The same is true here. Granting a preliminary injunction so that the status quo is maintained will avoid a threat to constitutional rights and will not burden the defendants. And "injunctions protecting First Amendment freedoms are always in the public interest." *Id.* at 859 (citations omitted).

## Conclusion

The district court's conclusion that the Professors lack standing to bring this challenge was erroneous. The Professors are suffering injury today from operation of the Act and the university policies, and their claims are ripe for review.

The Act and policies violate the Professors' First Amendment rights, as they infringe impermissibly on their academic freedom and are unconstitutionally overbroad and vague. This Court should preliminarily enjoin the challenged statutory and policy provisions.

s/ *Stevie J. Pactor*
Counsel of Record
Stevie J. Pactor
Kenneth J. Falk
Gavin M. Rose
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
spactor@aclu-in.org
kfalk@aclu-in.org
grose@aclu-in.org

Attorneys for Appellants

## Certificate of Compliance

I hereby certify that this brief conforms to Circuit Rule 32.

1.    This brief complies with the type-volume limitations set forth in Circuit Rule 32(c) because it contains 12,784 words based on the "Word Count" feature of Microsoft Word.

2.    This brief complies with the typeface and type style requirements set forth in Circuit Rule 32 because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Century Schoolbook font for the body of the brief and 11-point font for footnotes.

s/ *Stevie J. Pactor*
Attorney at Law

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STEVEN ALAN CARR,<br>DAVID G. SCHUSTER,<br>JAMES SCHEURICH, and<br>DAVID MCDONALD,<br><br>        Plaintiffs,<br><br>        v.<br><br>TRUSTEES OF PURDUE UNIVERSITY,<br>in their official capacities;<br>TRUSTEES OF INDIANA UNIVERSITY,<br>in their official capacities,<br><br>        Defendants.<br><br>STATE OF INDIANA,<br><br>        Intervenor. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 1:24-cv-1575-RLY-CSW |

**FINAL JUDGMENT**

The court, having granted the Defendants' and Intervenors' motions to dismiss for

lack of jurisdiction, now enters final judgment in their favor and against Plaintiffs.

**SO ORDERED** this 23rd day of July 2025.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Kristine Seufert, Clerk
United States District Court

_____
By: Deputy Clerk

S.A. 1

Distributed Electronically to Registered Counsel of Record.

S.A. 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STEVEN ALAN CARR,<br>DAVID G. SCHUSTER,<br>JAMES SCHEURICH, and<br>DAVID MCDONALD, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-1575-RLY-CSW |
| | ) | |
| TRUSTEES OF PURDUE UNIVERSITY,<br>in their official capacities;<br>TRUSTEES OF INDIANA UNIVERSITY,<br>in their official capacities, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Intervenor. | ) | |

**ENTRY ON THE UNIVERSITY DEFENDANTS' and the INTERVENOR STATE OF INDIANA'S MOTIONS TO DISMISS and PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs Steven A. Carr, David G. Schuster, James Scheurich, and David McDonald are tenured professors at Purdue University and Indiana University. They bring this action against Defendants Trustees of Purdue University and Trustees of Indiana University ("University Defendants") to enjoin enforcement of Senate Enrolled Act 202, which requires the trustees of public universities to promulgate and implement policies regarding faculty members' tenure and promotions, on grounds that it violates the First and Fourteenth Amendments to the United States Constitution. The University

S.A. 3

Defendants and Intervenor-Defendant State of Indiana (collectively "Defendants") have

moved to dismiss this suit for lack of subject matter jurisdiction.  For the reasons

explained below, Defendants' Motions to Dismiss are **GRANTED** and Plaintiffs' Motion

for Preliminary Injunction is **DENIED**.

## I.    Background

### A.    SEA 202

Effective July 1, 2024, Senate Enrolled Act 202 ("SEA 202" or the "Act") amends

the Indiana Code relating to higher education by creating Article 39.5, codified at Indiana

Code § 21-39.5 *et seq*., entitled "State Educational Institutions: The Protection of Free

Inquiry, Free Expression, and Intellectual Diversity."  The statutory prohibitions and

requirements imposed by this article apply to state higher educational institutions

(referred to in the Act as "institutions"), including the Universities and their Boards of

Trustees.  Ind. Code § 21-39.5-1.

Two sections of the Act are at issue—Indiana Code §§ 21-39.5-2-1(b) ("Section

1(b)") & 21-39.5-2-2(a)(1)–(2) ("Section 2(a)").  Section 1(b) provides, in relevant part:

> [E]ach board of trustees of an institution shall establish a policy that provides
> that a faculty member may not be granted tenure or a promotion by the
> institution if, based on past performance or other determination by the board
> of trustees, the faculty member is:
>
> > (1) unlikely to foster a culture of free inquiry, free expression, and
> > intellectual diversity within the institution; [or]
> >
> > (2) unlikely to expose students to scholarly works from a variety of
> > political or ideological frameworks that may exist within and are
> > applicable to the faculty member's academic discipline.

Ind. Code § 21-39.5-2-1(b)(1)–(2).  SEA 202 does not define the statutory terms "free

inquiry" and "free expression," but it does define "intellectual diversity" as "multiple,

divergent, and varied scholarly perspectives on an extensive range of public policy

issues."  Ind. Code § 21-39.5-1-5.

Section 2(a) further provides, in relevant part:

Not later than five (5) years after the date that a faculty member is granted
tenure by an institution and not later than every five (5) years thereafter, the
board of trustees of an institution shall review and determine whether the
faculty member has met the following criteria:

(1) Helped the institution foster a culture of free inquiry, free
expression, and intellectual diversity within the institution.

(2) Introduced students to scholarly works from a variety of political
or ideological frameworks that may exist within the curricula
established by the:

(A) board of trustees of the institution under IC 21-41-2-1(b); or

(B) faculty of the institution acting under authority delegated by the
board of trustees of the institution.

*Id*. § 21-39.5-2-2(a)(1)–(2).

In determining whether a faculty member has satisfied the criteria set forth in

Section 2(a), boards of trustees may not consider certain activities of a faculty member,

including "(1) [e]xpressing dissent or engaging in research or public commentary on

subjects"; "(2) [c]riticizing the institution's leadership"; and "(3) [e]ngaging in any

political activity conducted outside the faculty member's teaching duties at the

institution."  *Id*. § 21-39.5-2-2(c)(1)–(3).  Furthermore, "[n]othing in [Article 39.5] may

be construed to . . . [l]imit or restrict the academic freedom of faculty members or prevent

faculty members from teaching, researching, or writing publications about diversity, equity, and inclusion or other topics." *Id.* § 21-39.5-6-1(3).

Each institution is required to "adopt a policy that establishes disciplinary actions . . . that the institution will take if the board of trustees determines that a faculty member has failed to meet one (1) or more of the criteria described in" Section 2(a). *Id.* § 21-39.5-2-2(d). Such disciplinary actions include: "(1) termination; (2) demotion; (3) salary reduction; (4) other disciplinary action as determined by the institution; or (5) any combination of subdivisions (1) through (4)." *Id.*

Lastly, each institution is required to establish and communicate a procedure by which both students and employees may submit complaints that any faculty member "is not meeting the criteria described in section 2(a)(1) through 2(a)(5) of this chapter." *Id.* § 21-39.5-2-4(a)(1), (2). If any complaints are received, the Act requires the institution to refer them to "appropriate human resource professionals and supervisors for consideration in employee reviews and tenure and promotion decisions." *Id.* § 21-39.5-2-4(a)(3).

### B.    Plaintiffs

#### 1.    Professor David McDonald

David McDonald has been employed as an associate professor in the Department of Folklore and Ethnomusicality at Indiana University Bloomington since 2008. (Filing No. 36-9, McDonald Decl. ¶¶ 2, 4). He was awarded tenure in 2014 and has served two terms as Chair of his department. (*Id.* ¶¶ 3, 5). He plans to seek promotion as a full professor in 2025. (*Id.* ¶ 5).

Professor McDonald's research and courses focus on the ethnomusicology of violence, war, and social movements, with a special focus and expertise on issues related to Israel and Palestine and the Israeli-Palestinian conflict. (*Id.* ¶¶ 7, 22).

### 2.  Professor James Scheurich

James Scheurich has been employed as a tenured Chancellor's Professor in the School of Education at Indiana University Indianapolis since 2012. (Filing No. 36-10, Scheurich Decl. ¶¶ 2–4). He is also the Coordinator of the Urban Education Studies program, where he oversees the program's more than 70 doctoral students. (*Id.* ¶ 7).

Professor Scheurich's research and courses focus on issues relating to race, class, gender, sexuality, and disabilities in the educational system and society. (*Id.* ¶ 8).

### 3.  Professor Steven Alan Carr

Steven Alan Carr is employed as a Professor of Communication and the Graduate Program Director of the Department of Communication at Purdue University Fort Wayne (or "PFW"). (Filing No. 36-11, Carr Decl. ¶ 2). He also serves as the Director of the Institute for Holocaust and Genocide Studies at PFW. (*Id.* ¶ 6). He has been employed by PFW since 1994 and was awarded tenure in 2000. (*Id.* ¶¶ 3–4). He was promoted to full professorship in 2016. (*Id.* ¶ 4).

As a professor in the Communication Department, Professor Carr teaches courses in media and cultural studies. (*Id.* ¶ 7). As the Graduate Program Director of his department, Professor Carr advises approximately 20 graduate students on everything from admission to the completion of their final degree requirements. (*Id.* ¶ 8). As the Director of the Institute for Holocaust and Genocide Studies, he supports and promotes

teaching and research about the Holocaust and other genocides and promotes public

engagement in global genocide prevention efforts.  (*Id.* ¶ 9).

### 4.    Professor David F. Schuster

David Schuster is an associate professor in Purdue University Fort Wayne's

Department of History.  (Filing No. 36-12, Schuster Decl. ¶ 2).  He has been employed by

PFW since 2006 and was awarded tenure in 2012.  (*Id.* ¶¶ 3–4).  He intends to stay at

PFW and to seek a promotion to full professorship in the next several years.  (*Id.* ¶¶ 4–5).

Professor Schuster teaches courses in U.S. history, including the "culture wars"

surrounding the LGBTQ rights movement in the 1990s and slavery and its legacy.  (*Id.*

¶¶ 6, 20–21).

### C.    The Universities' Policies

#### 1.    Indiana University's Policies

Indiana University has taken preliminary measures to comply with the

requirements of the Act, effective June 14, 2024.  Policy ACA-37, entitled "Faculty and

Librarian Tenure," was amended to include the following requirement: "Grants of tenure

shall comply with the requirements of IC 21-39.5-2-1."  (Filing No. 36-1, Faculty and

Librarian Tenure at ECF p. 7).  Policy ACA-38, "Faculty and Librarian Promotions," was

amended to include this provision: "All faculty promotions must comply with the

requirements of IC 21-39.5-2-1."  (Filing No. 36-2, Faculty and Librarian Promotions at

ECF p. 4).  And ACA-21, "Faculty and Librarian Annual Reviews," was amended to add

that the procedures used in annual reviews shall "[c]omply with the requirements of IC

21-39.5."  (Filing No. 36-3, Faculty and Librarian Annual Reviews at ECF p. 3).

Professor McDonald characterized these changes as a "stop-gap measure until [the university] had the time to have faculty . . . do the kind of work necessary to revise the policies in such a manner that remained compliant with the law but also reflected . . . the values of the institution."  (Filing No. 41-8, 1/31/25 McDonald Dep. at 54–55).

Professor McDonald "understands" that Indiana University also amended its complaint process, managed university-wide through a platform called "EthicsPoint," to include complaints of a faculty member's failure to comply with the criteria set forth in the Sections (1)(b) and (2)(a)(1)–(2) of the Act.  (McDonald Decl. ¶ 19).  It is not clear from his declaration (which is undated) when this complaint process was instituted.

### 2.    Purdue University

Purdue also enacted interim policies required by the Act.  Standard S-27, entitled "Intellectual Diversity, Interim" became effective on July 1, 2024.  It provides:

> As a public institution in the state of Indiana, Purdue University endeavors to foster a culture of free inquiry, free expression and intellectual diversity. The University also endeavors to employ faculty, lecturers and teaching assistants who expose students to scholarly works from a variety of political or ideological frameworks within and applicable to the given academic discipline while refraining from subjecting students to views and opinions concerning matters not related to the discipline or assigned course of instruction.

> Faculty being reviewed for tenure and/or promotion are evaluated on criteria meant to assess their likeliness to contribute to the above goals in addition to the criteria outlined in the policy on **Academic Tenure and Promotion (I.B.2)**. Faculty members awarded tenure are evaluated at least every five years thereafter on the same criteria. For non-tenured faculty and other employees and individuals assigned teaching responsibilities, the University considers the individual's contributions to the above stated goals as part of the performance review process, prior to renewing employment agreements, and prior to awarding any bonuses. Failure to meet the established criteria

may result in appropriate disciplinary action up to and including termination
of employment.

(Filing No. 36-6, Intellectual Diversity, Interim at 1–2) (formatting in original).

Standard S-4, "Performance Reviews for Tenured, Tenure-Track,

Clinical/Professional and Research Faculty, Interim," last revised December 2, 2024,

provides that "each department/school/division head/chair will develop a performance

review process of all faculty in the head/chair's unit." (Filing No. 36-7, Performance

Reviews for Tenured, Tenure-Track, Clinical/Professional and Research Faculty, Interim

at ECF p. 4). "In accordance with Indiana law," annual assessments "will include

consideration of" whether the professor has "exposed students to scholarly works from a

variety of political or ideological frameworks that may be within and applicable to the

given academic discipline." (*Id.*).

Finally, in a document entitled "Operating Procedures for Complaints Related to

Intellectual Diversity," Purdue describes how students, faculty, and staff may file a

complaint based on, for example, a faculty member's failure to "[f]oster[] a culture of free

inquiry, free expression, and intellectual diversity." (Filing No. 36-8, Operating

Procedures for Complaints Related to Intellectual Diversity at ECF p. 1).

### D.    Changes in the Classroom

Plaintiffs testified that they do not know what it means to "foster a culture of free

inquiry, free expression, and intellectual diversity within the institution." (McDonald

Decl. ¶ 20; Scheurich Decl. ¶ 21; Carr Decl. ¶ 22; Schuster Decl. ¶ 18). In their efforts to

comply with the Act and their institutions' implementing policies, they testified that they

have altered the content and pedagogy of their courses. (McDonald Decl. ¶ 33; Scheurich

Decl. ¶¶ 33–34; Carr Decl. ¶ 35; Schuster Decl. ¶ 31).

For example, Professor McDonald has "drastically" changed the number and types

of readings and other required course materials used to teach about the history and culture

of Palestine. (McDonald Decl. ¶ 33). He has also eliminated in-class discussion of

political topics and themes, focusing instead on class lectures. (*Id.* ¶ 34). Professor

Scheurich feels constricted in what he is comfortable saying in his classes, even if his

statements are supported by social science literature, for fear someone will complain that

he is not fulfilling the mandates of "intellectual diversity." (Scheurich Decl. ¶ 35).

Professor Carr cut back on assigned readings in his 2024 fall semester graduate class to

focus more on the mechanics of writing and less on substantive content. (Carr Decl.

¶ 36). He also omitted assigned readings that a student could potentially view or

challenge as one-sided. (*Id.*). And in his spring classes, he omitted clips of films that he

otherwise would have shown, such as *Lawrence of Arabia* (1962), due to its depictions of

Arabs and Arab culture. (*Id.* ¶ 37). Professor Schuster no longer begins his classes with

current event discussions with his students because he believes if a student feels unheard,

dismissed, or targeted because of their viewpoint, he may be held responsible for failing

to create a culture of free inquiry, free expression, and intellectual diversity. (Schuster

Decl. ¶ 33). He also refrains from giving his personal opinion on controversial issues

(such as whether the United States was justified in dropping the atomic bomb on Japan

during World War II) that are the subject of his courses, even if asked to give one by a

student. (*Id.* ¶ 35).

### E.    Prior Litigation

On May 7, 2024, Plaintiffs first sued the University Defendants before the Act took effect on July 1, 2024, and before the Universities had established any policies, alleging Section 1(b)(1) & (2) and Section 2(a)(1) & (2) of the Act are unconstitutional because they "impinge upon the plaintiffs' academic freedom" and are "impermissibly vague." (*Carr v. Trs. of Purdue Univ.*, No. 1:24-cv-772-SEB-MJD (S.D. Ind.), Filing No. 19, Am. Compl. ¶¶ 69–70). Plaintiffs filed their Motion for Preliminary Injunction on July 8, 2024, and the State of Indiana intervened as of right to defend the Act's constitutionality.

On August 14, 2024, the court granted the University Defendants' and the State's Motions to Dismiss without prejudice, finding "no standing or ripeness regarding Plaintiffs' claims." *Carr v. Trs. of Purdue Univ.*, No. 1:24-cv-772-SEB-MJB, 2024 WL 3819424, at *5 (S.D. Ind. Aug. 14, 2024). Having made that ruling, the court denied Plaintiffs' Motion for Preliminary Injunction. *Id.* at *7.

### F.    This Lawsuit

Plaintiffs filed the present lawsuit four weeks later, alleging the same claims against the same parties.[1] Plaintiffs allege that "Indiana Code §§ 21-39.5- 2-1(b)(1), (2) and Indiana Code §§ 21-39.5-2-2(a)(1), (2) and the policies that the Universit[ies] adopted as directed by these statutes, violate the First Amendment to the extent they

---

[1] Plaintiff filed two separate but parallel complaints—one against the Trustees of Indiana University (1:25-cv-1575) and the other against the Trustees of Purdue University (1:24-cv-00578). These cases were consolidated on October 28, 2024. (*See* Filing No. 23, Order).

S.A. 12

infringe the plaintiffs' academic freedom" and "violate the First Amendment and the Due

Process Clause of the Fourteenth Amendment in that they are impermissibly vague."

(Filing No. 1, Compl. ¶¶ 70–71).

Plaintiffs have filed a motion for a preliminary injunction, asking the court to

enjoin Section (b)(1) & (2) and Section 2(a)(1) & (2) of the Act, as well as "defendants'

policies." (Compl., Request for Relief ¶ c). The University Defendants and the State

oppose Plaintiff's motion and move to dismiss their claims on grounds that Plaintiffs have

not satisfied Article III's standing and ripeness jurisdictional requirements.

Before addressing whether Plaintiffs are entitled to a preliminary injunction, the

court must first consider the threshold question of jurisdiction. *Steel Co. v. Citizens for a

Better Env't*, 523 U.S. 83, 94 (1998) (holding the court must resolve jurisdictional issues

before merits issues).

## II.    Legal Standard

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter

jurisdiction. The court accepts as true all well-pleaded factual allegations and draws all

reasonable inferences in favor of the plaintiff. *Ctr. for Dermatology & Skin Cancer, Ltd.

v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014). Where, as here, the defendant raises a

factual challenge to jurisdiction, the court may "properly look beyond the jurisdictional

allegations of the complaint and view whatever evidence has been submitted on the

issue." *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009). The

plaintiff bears the burden of establishing that all jurisdictional requirements have been

met. *Burwell*, 770 F.3d at 588.

### III.    Discussion

Article III of the Constitution limits the federal courts' subject matter jurisdiction
to resolving actual "Cases" and "Controversies." *Nabozny v. Optio Sols., LLC*, 84 F.4th
731, 733 (7th Cir. 2023) (citing U.S. Const. art. III, § 2).  This limitation "requires a claim
that is ripe and a plaintiff who has standing." *Ind. Right to Life, Inc. v. Shepard*, 507 F.3d
545, 549 (7th Cir. 2007).  These concepts are related yet distinct: "Whereas ripeness is
concerned with *when* an action may be brought, standing focuses on *who* may bring
a ripe action." *Id.* (quoting *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1298 n.1 (3d Cir.
1996)).

### A.    Standing

To establish Article III standing, "[t]he plaintiff must have (1) suffered an injury in
fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is
likely to be redressed by a favorable decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338
(2016).  "Standing must exist at the time the lawsuit is filed." *Patterson v. Howe*, 96
F.4th 992, 1000 (7th Cir. 2024).  The plaintiff bears the burden of establishing the
elements of standing.  *Spokeo*, 578 U.S. at 338.

This case primarily concerns the first element, which requires the plaintiff's injury
be "concrete and particularized" and "actual or imminent, not conjectural or
hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (cleaned up)
(quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Where a plaintiff brings a
pre-enforcement facial challenge under the First Amendment, a "plaintiff[] must make
one of two showings to establish an injury in fact." *Speech First, Inc. v. Killeen*, 968 F.3d

628, 638 (7th Cir. 2020) (citing *Susan B. Anthony List*, 573 U.S. at 158–59).  "First, a

plaintiff may show an intention to engage in a course of conduct arguably affected by a

policy, and that he faces a credible threat the policy will be enforced against him when he

does." *Id.*  "Second, a plaintiff may show a chilling effect on his speech that is

objectively reasonable, and that he self-censors as a result." *Id.*  Like the first showing, a

plaintiff proceeding under the second showing must also show a credible threat of

enforcement.  *Id.* at 639 n.1 ("Either [under the first or second showing], a credible threat

of enforcement is critical; without one, a putative plaintiff can establish neither a realistic

threat of legal sanction if he engages in the speech in question, nor an objectively good

reason for refraining from speaking and 'self-censoring' instead.'") (quoting *Abbott v.*

*Pastides*, 900 F.3d 160, 176 (4th Cir. 2018)).

　　Self-censorship of protected speech may qualify as an Article III injury, provided the

plaintiffs have "an 'actual and well-founded fear' that the law will be enforced against them."

*Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) (quoting *Virginia v. Am. Booksellers Ass'n,*

*Inc.*, 484 U.S. 383, 393 (1988)).  "[T]o ensure that the risk of prosecution is 'credible,' plaintiffs

must demonstrate that their fear is both actual and reasonable, not 'imaginary or speculative.'"

*Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

　　Here, Plaintiffs argue they have engaged in acts of self-censorship "in an attempt

to comply with the challenged policies and the Act."  (Filing No. 44, Pl.'s Resp. at 9).

These acts of self-censorship are detailed in Section I.D. of this opinion.  To summarize,

they have "changed the content and pedagogy of their courses," "altered and continue to

alter the readings they assign and discuss," and "have modified and continue to modify

the format of their courses." (*Id.*).  The court finds Plaintiffs have adequately shown they have an actual fear of enforcement that has chilled their protected speech.  The issue is whether that fear is well-founded.

Plaintiffs' fear that the Act will be enforced against them is not well-founded. Section 1(a) of the Act "applies to . . . *institution[s]*" and requires their boards of trustees to "establish a policy that provides that a faculty member may not be granted tenure or a promotion" if certain criteria are not met.  Ind. Code § 21-39.5-2-1(a)–(b)(2) (emphasis added).  Section 2 provides that "the board of trustees. . . shall review and determine whether the faculty member has met" the criteria set forth in the statute.  *Id.* § 21-39.5-2-2(a).  Therefore, as the court previously held in *Carr*, by its terms, the Act governs the Trustees of the Universities, not individual faculty members like Plaintiffs.  *Carr*, 2024 WL 3819424, at *6.

Even if the Act applied to Plaintiffs, the "chilling effect . . . of a potentially unconstitutional law being on the books is insufficient to justify federal intervention in a pre-enforcement suit."  *Whole Women's Health v. Jackson*, 595 U.S. 30, 50 (2021) (cleaned up).  This is so "whether the challenged law in question is said to chill . . . the freedom of speech, . . . or any other right."  *Id.*  Speculation that policy language might be "misapplied," such as by disregarding key portions, cannot suffice either.  *Schirmer v. Nagode*, 621 F.3d 581, 583 (7th Cir. 2010).

Plaintiffs' fear that the Universities' implementing policies will be enforced against them is not well-founded either.  At the time this lawsuit was filed on September 13, 2024, those policies were nothing more than preliminary and interim measures, with

policymaking and implementation still ongoing.  For example:

- Professor McDonald, who serves on the Bloomington Faculty Council or "BFC,"[2]

  testified that to his knowledge, no SEA 202-related policy has been officially

  enacted.  (Filing No. 41-13, 6/12/24 McDonald Dep. at 123).  University policy is

  "still undergoing revision and change in committee, and . . . eventually it will be

  brought to the full BFC for vote."  (*Id.*).  Once it has been approved by vote and

  made university policy, "that policy will then be carried to the units, the schools

  and Colleges, and to individual departments to modify their various documents

  such that they remain in compliance."  (*Id.*; *see also* 1/31/25 McDonald Dep. at 56

  (explaining "first we have a campus policy, before we can have a College policy,

  before we can have a department policy, before we can have a faculty member

  actually implement those policies")).  "So it takes a lot of time."  (1/31/25

  McDonald Dep. at 56).

- Professor Carr reports that at Purdue University Fort Wayne, implementation of

  SEA 202, as well as policymaking and development of guidance, is "an ongoing

  process," with "interim" university-wide measures "subject to potential revision."

  (Carr Dep. at 48–49).  His department—the Department of Communication—has

  not "enacted or formalized any policies or procedures concerning 202."  (*Id.* at

  49).  Professor Schuster has a similar understanding of SEA 202's implementation

---

[2] The BFC is the faculty representative board that "consult[s] with university administrators on
the formation of policy and the implementation and compliance" with such policy.  (McDonald
Dep. at 32–33).

at Purdue.  (Schuster Dep. at 81 (noting that "at Purdue, SEA 202 implementation

is an ongoing process," with "Purdue ha[ving] issued interim measures" that are

"subject to revision")).

As the court observed in *Carr*:

> Plaintiffs have not addressed whether (or how) the [Universities'] interim
> policies arguably enhance their First Amendment concerns or otherwise
> heighten the threat of harm to them.  Absent the formulation and enforcement
> of these final policies, it is impossible to determine whether Plaintiffs do in
> fact have an "objectively good reason for refraining from speaking and self-
> censoring instead."

*Carr*, 2024 WL 3819424, at *6 (quoting *Speech First*, 968 F.3d at 638 n.1).

The court understands that on August 25, 2024, Professor McDonald received four

complaints (one student, one parent, and two anonymous) after he participated in a

faculty panel on "Politics, Thought, Voice" sponsored by the Intensive First Year ("IFS")

Seminar at Indiana University.  (McDonald Decl. ¶ 32).  These complaints asserted that

his talk on the war in Gaza, which ended with a short video clip of protest chants on

campus, contained an "Anti-Israel" message.  (*Id.*).  Professor McDonald provided a copy

of his remarks and the video clip to the IFS Director.  (*Id.*; 1/31/25 McDonald Dep. at 79;

Filing No. 41-6, McDonald Email at ECF p. 2). "From that point, it was [his]

understanding that [the IFS Director] and several other folks in the College determined

that the complaints were without merit.  And the matter was dropped."  (McDonald Email

at ECF p. 2).

This incident does not reflect a credible threat that Indiana University's interim

SEA-related policies will be used against Professor McDonald or any other Plaintiff.  As

Professor McDonald admits, these complaints were made before the university had

"established its online portal for accepting complaints regarding SEA 202," and thus,

were not made under Indiana University's policies.  (McDonald Decl. ¶ 43; 1/31/25

McDonald Dep. at 74; Filing No. 41-6, McDonald Email at ECF p. 2).  But even if the

complaints were submitted through Indiana University's SEA 202 complaint process,

Professor McDonald was *not* subjected to any discipline or threatened discipline from

Indiana University based on his August 25 speech.

     After this case was filed, Professor Scheurich reported that Indiana University

Indianapolis passed three policies consistent with SEA 202 on January 14, 2025.

(Scheurich Dep. at 24–26, 40, 85).  Professor Scheurich's testimony suggests that more

SEA 202 policies are on the horizon.  (*Id.* at 40 ("Q: [Y]ou don't believe the five-year

post-tenure review is reflected in these three policies that the IFC passed in January?  A: I

don't think so. . . .  Q: So would you be willing to say that the process of implementation

is still ongoing[?]  A: Oh, yeah, yeah."); *see also id.* at 44–45 ("Q: "[W]ould you say that

it would take a while for all of these different units to implement SEA 202 specifically?

A: I don't know if I would say that or not because we have been struggling with it, you

know?")).  These policies are not in evidence nor mentioned or challenged in Plaintiffs'

Response.  In addition, Purdue's Intellectual Diversity policy became effective as of June

1, 2025.[3]  (*See* Filing No. 49-1, Intellectual Diversity Policy).

---

[3] The amended policy's terms are substantially the same as the "interim" policy.  (Filing No. 49-2
(indicating revisions using Microsoft Word's "compare documents" tool)).

Even if the court could consider these policies for purposes of standing, they do not bolster Plaintiffs' case. First, Plaintiffs offer no analysis of the policies—even the interim policies—and explain how the *terms of those policies* have chilled their speech. Second, they provide no evidence of any imminent enforcement of the policies against them, forcing them to self-censor. They do not claim that the Universities have instructed them to change their syllabi or pedagogies or that the Universities have received any complaints against them since these policies took effect. In short, no action or threatened action has been taken against Plaintiffs based on any university SEA 202-related policy. Plaintiffs' acts of self-censorship, without more, do not satisfy Article III as to the claims against the University Defendants. *See, e.g.*, *Carr*, 2024 WL 3819424, at *5-6 (Plaintiffs "'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'" (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013))).

### B.     Ripeness

The doctrine of ripeness "seeks to avoid the premature adjudication of cases when the issues posed are not fully formed, or when the nature and extent of the statute's application are not certain." *Triple G Landfills, Inc. v. Bd. of Comm'rs of Fountain Cnty.*, 977 F.2d 287, 288–89 (7th Cir. 1992). A claim is not ripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up).

Plaintiffs' case is not ripe for the same reasons Plaintiffs lack standing. *See Commonwealth Edison Co. v. Train*, 649 F.2d 481, 483–84 (7th Cir. 1980) (noting that in

some cases, "the concepts of standing and ripeness merge . . . , [as] [b]oth concepts

recognize that, for both constitutional and prudential reasons, the courts should not

attempt to decide cases that do not reflect a current controversy between the parties").  At

this juncture, the policies remain largely interim and subject to change, there have been

no complaints filed by students or employees against Plaintiffs or any other faculty

member pursuant to § 21-39.5-2-4 of the Act, and there has been no enforcement action

or threatened enforcement action against Plaintiffs or any other faculty member by either

Purdue or Indiana University pursuant to any SEA 202-related policy.  Accordingly,

Plaintiffs' case must be dismissed for lack of jurisdiction.

## III.    Conclusion

For the reasons explained above, Intervenor State of Indiana's Motion to Dismiss

for Lack of Subject Matter Jurisdiction (Filing No. 40) is **GRANTED**, the University

Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Filing No. 42) is

**GRANTED**, and Plaintiffs' Motion for Preliminary Injunction (Filing No. 12) is

**DENIED**.

**IT IS SO ORDERED** this 23rd day of July 2025.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.

S.A. 21

**Statement of Compliance with Circuit Rule 30(d)**

Pursuant to Circuit Rule 30(d), I hereby certify that all materials required by Circuit Rule 30(a) are included within the appendix. There are no materials within the scope of Circuit Rule 30(b).

s/ *Stevie J. Pactor*
Stevie J. Pactor
Attorney at Law
