IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
No. 25-2366
_____

DAVID MCDONALD, ET AL.,

Plaintiffs-Appellants,

v.

TRUSTEES OF INDIANA UNIVERSITY, ET AL.,

Defendants-Appellees

and

STATE OF INDIANA,

Intervenor/Defendant-Appellee
_____

On Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division
No. 1:24-cv-1575-RLY-CSW
The Honorable Richard L. Young, Judge

---

**REPLY BRIEF OF APPELLANT**
_____

Stevie J. Pactor
*Counsel of Record*
Kenneth J. Falk
Gavin M. Rose
Joshua T. Bleisch
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
spactor@aclu-in.org
kfalk@aclu-in.org
grose@aclu-in.org
jbleisch@aclu-in.org

Attorneys for Appellants

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 5

ARGUMENT............................................................................................................... 7

I.  The Professors have standing to bring their claims, which are ripe, and the dismissal of their claims was erroneous.......................................................................................... 7

   A.  The Professors' actions in response to the Act and university policies are based on a credible threat of enforcement ................................................................................... 7

   B.  The Professors' experiences of chill and compulsion are objectively reasonable......... 13

   C.  The Act and policies are the causes of the Professors' injuries ..................................... 16

II.  The Professors' academic instruction is their own speech protected by the First Amendment, and they are likely to succeed on the merits of their claim that the Act and the attendant policies violate that right......................................................................... 17

   A.  As this Court has already concluded, the Professors' classroom instruction is their own speech and not the government's ................................................................................ 18

   B.  Neither the State nor the Universities satisfy their heightened burden under *NTEU*.. 21

III.  The other factors for preliminary relief are met ............................................................ 25

CONCLUSION ......................................................................................................... 26

CERTIFICATE OF COMPLIANCE ....................................................................... 27

CERTIFICATE OF SERVICE ................................................................................. 28

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,* 600 U.S. 570 (2023) ........................................................ 13

*Adams v. Trs. of the Univ. of N.C.-Wilmington,* 640 F.3d 550 (4th Cir. 2011) ....................... 18

*Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289 (1979) ..................................... 12, 13

*Brown v. Kemp,* 86 F.4th 745 (7th Cir. 2023) ........................................................ 13, 14, 15

*Buchanan v. Alexander,* 919 F.3d 847 (5th Cir. 2019) ................................................. 18

*Christian Legal Soc'y v. Walker,* 453 F.3d 853 (7th Cir. 2006) ........................................ 25, 26

*Ctr. for Individual Freedom v. Madigan,* 697 F.3d 464 (7th Cir. 2012) ................................. 7

*Demers v. Austin,* 746 F.3d 402 (9th Cir. 2014) ..................................................... 18, 23

*Elrod v. Burns,* 427 U.S. 347 (1976) ............................................................... 25

*Fellowship of Christian Univ. Students at Univ. of Texas at Dallas v. Eltife,* No. 1:25-CV-1411-DAE, 2025 WL 2924228 (W.D. Tex. Oct. 14, 2025) ........................................... 24

*Geinosky v. City of Chicago,* 675 F.3d 743 (7th Cir. 2012) .......................................... 9

*Grutter v. Bollinger,* 539 U.S. 306 (2003) ......................................................... 20

*Heim v. Daniel,* 81 F.4th 212 (2d Cir. 2023) ....................................................... 18, 21

*Holder v. Humanitarian Law Project,* 561 U.S. 1 (2010) ............................................. 13

*Indiana Right to Life Victory Fund v. Morales,* 112 F.4th 466 (7th Cir. 2024) ........................ 13

*Keyishian v. Board of Regents of Univ. of State of N.Y.,* 385 U.S. 589 (1967) ........................ 20

*Kilborn v. Amiridis,* 131 F.4th 550 (7th Cir. 2025) ................................................passim

*Lane v. Structural Iron Workers Loc. No. 1 Pension Tr. Fund,* 74 F.4th 445 (7th Cir. 2023) ... 18

*Meriwether v. Hartop,* 992 F.3d 492 (6th Cir. 2021) ................................................. 18

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.,* 641 F. Supp. 3d 1218 (N.D. Fla. 2022) .. 19

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois,* 391 U.S. 563 (1968) 21

*Pit Row, Inc. v. Costco Wholesale Corp.,* 101 F.4th 493 (7th Cir. 2024) ............................. 17

*Schneider v. State of New Jersey,* 308 U.S. 147 (1939) .............................................. 24

*Speech First, Inc. v. Killeen,* 968 F.3d 628 (7th Cir. 2020) ......................................... 5, 7, 14

*Sweezy v. State of N.H. by Wyman,* 354 U.S. 234 (1957) ............................................. 20

*Taylor v. Salvation Army Nat'l Corp.,* 110 F.4th 1017 (7th Cir. 2024) ............................... 16

*United States v. National Treasury Employees Union,* 513 U.S. 454 (1995) ............................ 18, 21, 25

*W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624 (1943) ......................................... 24

*Webster v. New Lenox Sch. Dist. No. 122,* 917 F.2d 1004 (7th Cir. 1990) ............................. 20

**Indiana Statutes and Regulations**

Ind. Code § 21-39.5 ............................................................................... 8

Ind. Code § 21-39.5-2-1 .......................................................................... 7, 8, 23

**University Policies**

ACA-21 [IU] ...................................................................................... 8

ACA-37 [IU] ...................................................................................... 8

ACA-38 [IU] ................................................................................................................ 8

Standard S-27 [Purdue] ......................................................................................... 8

Standard S-4 [Purdue] ............................................................................................ 8

# INTRODUCTION

The plaintiffs-appellants ("the Professors") have standing to bring these claims, which are ripe. To satisfy the injury-in-fact requirement of standing in a pre-enforcement challenge, a plaintiff may show (1) "an intention to engage in a course of conduct arguably affected by a policy, and that he faces a credible threat the policy will be enforced against him when he does" or (2) "a chilling effect on his speech that is objectively reasonable," rather than a fear that is "notional or subjective," and "that he self-censors as a result." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638-39 (7th Cir. 2020)*as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020) (citations omitted). The Professors' academic speech, including their curricula and pedagogies, are affected by both S.E.A. 202 ("the Act") and the implementing policies enacted by Indiana and Purdue Universities ("the Universities"). Those policies (which implement the specific requirements of the Act) are in effect today, and at no point have the Universities stated that they will not enforce them against the Professors. In fact, public reporting indicates that these policies not only will be enforced but have already been enforced against instructors.

As a result, the Professors have altered and continue to alter the readings they assign and discuss, they have changed and continue to change the content they present, and they have modified and continue to modify the format of their courses. The

Professors' academic speech is both chilled and compelled by the Act and the policies, and this chill and compulsion is objectively reasonable.

Because the district court determined that it lacked subject-matter jurisdiction over this matter, it did not consider the merits of the Professors' motion for preliminary injunction. Following this Court's recent decision in *Kilborn v. Amiridis*, 131 F.4th 550 (7th Cir. 2025), there can be no doubt that the Professors have a protected First Amendment interest, based on their academic freedom, in their curricula and pedagogies. Neither the Universities nor the intervenor State can show any interest in the restrictions imposed on the Professors' speech, let alone an interest sufficient to satisfy the heightened scrutiny that applies to this type of restraint. The Professors are likely to succeed on the merits of their claim that the Act and policies violate their First Amendment rights.

This Court may decide the preliminary-injunction request, in lieu of remand, given that the record is developed and this issue presents a pure question of law. Rather than further prolong a First Amendment violation, it should do so. All of the requirements for a preliminary injunction are met, and this case should be remanded to the district court with instruction that a preliminary injunction should issue.

**ARGUMENT**

I.     The Professors have standing to bring their claims, which are ripe, and the dismissal of their claims was erroneous

As the Professors have highlighted, and as the State and Universities agree, "[a] plaintiff does not have to await the consummation of threatened injury to obtain preventive relief." *Ctr. for Individual Freedom v. Madigan,* 697 F.3d 464, 473 (7th Cir. 2012) (citations omitted). Rather, he may establish the existence of an injury in fact in either of two ways: by showing (1) "an intention to engage in a course of conduct arguably affected by a policy, and that he faces a credible threat the policy will be enforced against him when he does" or (2) "a chilling effect on his speech that is objectively reasonable," rather than a fear that is "notional or subjective," and "that he self-censors as a result." *Speech First,* 968 F.3d at 638-39, *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020) (citations omitted). The Professors have shown both.

   A.     The Professors' actions in response to the Act and university policies are based on a credible threat of enforcement

S.E.A. 202 ("the Act") requires the Universities to implement policies that carry out its terms. Those challenged policies, duly enacted by the Universities, are currently in effect, apply to the Professors, and impose duties and obligations on them. As the Professors have already detailed, Indiana University chose to implement the Act's requirements simply by incorporating the terms of the statute into formal policies: grants of tenure "shall comply with the requirements of IC 21-39.5-2-1" (Dkt. 36-1 at 7 [ACA-

37]); faculty promotions "must comply with the requirements of IC 21-39.5-2-1" (Dkt. 36-2 at 4 [ACA-38]); and the procedures used in faculty reviews shall "comply with the requirements of IC 21-39.5" (Dkt. 36-3 at 3 [ACA-21]).  Purdue University accomplished this using different verbiage, and it enacted policies (both the "interim" and "final") that restate the requirements of the Act.  (Dkts. 36-6 at 1-2, 49-1, 49-2 [Standard S-27]); Dkts. 36-7 at 1, 4, 51-1, 51-2 [Standard S-4]).  To state it plainly, each university's policies have incorporated the Act so that the Act and its terms apply on their campuses.

At the risk of unnecessary repetition of this basic fact, the existing policies are binding on every campus and are being enforced now.  (Dkts. 36-5 at 2; 36-6 at 1; 36-7 at 2-3; 49-1; 49-2; 51-1; 51-2).[1]  The State and Universities respond by contending that because efforts are ongoing at the campus and department levels to develop *additional*, but subordinate, implementing policies, there is no credible threat of enforcement today of the existing university-wide policies.  (State's Br. at 26-27; Universities' Br. at 23-28). The State and the Universities necessarily contend that each professor must wait until both his campus and his department develop and implement their own subordinate policies before he has standing to challenge the existing university-wide ones, even though the university-wide ones remain unchanged.  This is stretching the requirements

---

[1]    The State refers to the Universities' policies as the "Initial Policies."  Certainly the Professors agree that the first enactment of any policy could accurately be referred to as "initial." But to the extent that the State employs this term to imply that different or amended policies are forthcoming, or even contemplated, no such evidence has been produced. Indeed, as previously highlighted, the policies in effect have remained identical in material terms. (Dkts. 49-2, 51-2).

of injury-in-fact far beyond their breaking point, as the Professors are being injured today by the university-wide policies that do exist and will continue to exist into the future.

But, unlike many pre-enforcement challenges, it is not necessary for this Court to resolve, in the abstract, the threat that the Universities will enforce their policies. This is because, as public reporting makes clear, they have already done so. The challenged policies are being enforced now. Any yet-to-be-completed local policy making and implementation efforts were no impediment to Indiana University processing an S.E.A. 202 complaint submitted, not by a student, but by an Indiana senator, regarding a School of Social Work lecturer's display and discussion of a diagram in a graduate-level class, all as reported by the media. *See* https://www.nytimes.com/2025/11/13/us/indiana-university-professor-white-supremacy-lesson.html (last accessed December 9, 2025).[2] It was further reported that Indiana University suspended the lecturer from some of her teaching duties while it investigated the complaint and has issued sanctions against her, which she is appealing. *See* https://www.idsnews.com/article/2025/12/jessica-adams-returns-to-class-sea-202-aaup-indiana-university-news (last accessed Dec. 9, 2025). She was given a written warning (which will be permanently enshrined in her personnel

---

[2]     A plaintiff appealing dismissal "may elaborate on his factual allegations," including by referencing news reports that postdate the dismissal, "so long as the new elaborations are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 fn.1 (7th Cir. 2012) (articulated in the context of a motion under Federal Rule of Civil Procedure 12(b)(6)). Certainly these elaborations are consistent with the pleadings.

record) and is now required to comply with a host of other burdensome requirements. *Id.*[3] The State and Universities treat this issue as if there are no policies that can currently be violated or enforced on the Professors, and that clearly is not so.

According to the State and the Universities, a series of professors could face these circumstances and sanctions, one after the other during "ongoing policymaking," but so long as the plaintiff-Professors were not among them, they could not show a credible threat of enforcement sufficient to establish injury. (*See* State's Br. at 26 ["Without any details regarding what those future [campus/department] policies will contain, the Plaintiffs cannot establish standing."]). This is simply demanding too much of the showing of injury sufficient to demonstrate standing. And, from a practical perspective, it requires the Professors to suffer the ongoing deprivation of their First Amendment rights (since the university-wide policies are in effect today) while awaiting the development (on an uncertain but obviously prolonged timeline) of subordinate policies that cannot contradict the challenged university-wide policies.

In any event, there is no dispute that campus and department level policies, including any that may materialize regarding the Act, are all subordinate to university-

---

[3]     In its response brief, the State dismissively chided several of the Professors for their concerns—characterized as "speculation"—that "third parties might 'weaponize[]' university policies to retaliate against professors they wish to harm, or that 'outside political people' might use them to effectuate some nebulous political motive." (State's Br. at 27 [citing Dkt. 41-9 at 46, Dkt. 41-10 at 39, 78]). Particularly given their prescience, the Professors' concerns can hardly be described as "speculation."

wide policies. The Professors certainly do not dispute that subordinate policies may supply additional guidance to faculty on how to comply with the university policies. But as the Universities themselves highlighted in their brief—quoting a description given by Professor McDonald—the entire purpose of the subordinate policies is to implement the university-wide ones. (Universities' Br. at 25 ["Once it has been approved by vote and made university policy, that policy will then be carried to the units, the schools and Colleges, and to individual departments to modify their various documents such that they remain in compliance.'"] [citations omitted]).[4] All of the Professors emphasized that, whatever policies their campuses or departments may ultimately develop, the university-wide policies apply to them and impose the requirements mandated by the Act. (Dkts. 41-7 at 91-92; 41-8 at 41-42; 41-9 at 55; 41-10 at 91-92). These subordinate department or campus level policies or directives can neither undo nor lessen the harms inflicted by the university policies and the Act, which govern.

---

[4]     Both the State and the Universities seem to misapprehend the meaning of one line of Professor McDonald's testimony, quoted by both, regarding the role of campus and department policies. (State's Br. at 26, Universities' Br. at 26 [quoting Professor McDonald as saying "first we have to have a campus policy, before we can have a College [of Arts and Sciences] policy, before we can have a department policy, *before we can have a faculty member actually implement those policies in their teaching and research*"] [citing Dkt. 41-8 at 16] [emphasis added by Universities]). Surrounding testimony makes clear that Professor McDonald was not indicating that faculty members do not follow university-wide policies where there are no corresponding campus or department level counterparts. Rather he indicated that, procedurally, the university-wide policies are required to come first, and each subservient policy is then "contingent on" the policies at superior administrative levels. (Dkt. 41-8 at 16-17).

The Professors' circumstances present a far greater credible threat of enforcement than the Supreme Court found sufficient in *Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289 (1979). There, a state statute prohibited the dissemination of "dishonest, untruthful, and deceptive publicity." *Id.* at 302 The plaintiffs had engaged in truthful publicity campaigns in the past and intended to do so in the future. *Id.* Although they had no intention or plan to "propagate untruths," they contended that "erroneous statement is inevitable in free debate," and therefore they feared the statute would be enforced against them. *Id.* Of course, they could not point to a specific "false" statement they would make in the future—indeed, they were explicit that they intended not to. But given the circumstances, the Supreme Court concluded that the plaintiffs' fear of enforcement was not "imaginary or wholly speculative" and that they had standing to challenge the statute. *Id.*

The threat of enforcement against the Professors is credible for another straightforward reason: the Universities have never disavowed enforcement. The Professors have provided lengthy descriptions of the specific curricula and pedagogies they would normally engage in but are concerned would subject them to enforcement of the Act and policies—all of which were credited by the district court and none of which have been disputed by the State or the Universities. (S.A. at 10-11; Appellants' Br. at 9-10, 12-18). The Universities could at any point have simply stated that the circumstances articulated by the Professors would not provide grounds for sanction as a violation of

their policies. As in *Babbitt* and a host of other cases, the Universities' failure to disclaim enforcement constitutes evidence of a credible threat. 442 U.S. at 302; *see also, e.g., 303 Creative LLC v. Elenis,* 600 U.S. 570, 583 (2023) (approving finding of standing where State had declined to disavow future enforcement proceedings against plaintiff); *Holder v. Humanitarian Law Project,* 561 U.S. 1, 16 (2010) (same); *Indiana Right to Life Victory Fund v. Morales,* 112 F.4th 466, 470 (7th Cir. 2024) (same); *Brown v. Kemp,* 86 F.4th 745, 769 (7th Cir. 2023).

The challenged Act and policies apply to the Professors and they face a credible threat of enforcement.

B.     The Professors' experiences of chill and compulsion are objectively
       reasonable

The district court found, and the Universities and the State do not dispute, that the Professors' speech has both been chilled and compelled by the Act and policies. For the same reasons that the Professors face a credible threat of enforcement, their experiences of chill and compulsion are objectively reasonable and cannot be characterized as self-inflicted harms used to manufacture standing.

Beyond their erroneous assertion that it is unreasonable for the Professors to be "chilled" in their activities in the absence of subordinate policies, neither the State nor the Universities advance any argument that the changes the Professors have made in their courses as a result of the Act and the challenged policies are unreasonable. Clearly they are not. A chill (and the flipside of that coin, compelled speech) is "objectively

reasonable" if it is not "notional or subjective." *Speech First*, 968 F.3d at 638-39. Objective reasonableness may be supported by evidence of active enforcement of the challenged provisions against other individuals. *See Kemp*, 86 F.4th at 768. And a plaintiff's particularized description of the specific harms effecting the chill also enables a Court to determine its objective reasonableness. *Speech First*, 968 F.3d at 638-39 ("For either that credible threat of enforcement or chilling effect to be particularized, it must affect the plaintiff in a personal and individual way." (quotations and citations omitted)).

The Professors have articulated, in detail, many ways in which—specific to their own areas of professional expertise, curricula, and pedagogies—the Act and policies have caused them to chill their speech and to engage in compelled speech. All of them teach in areas where "divergent" scholarly perspectives and alternative "political [and] ideological frameworks" exist regarding key topics and issues, including many that are considered controversial. (Dkts. 36-9 at 5 ¶ 22; 36-10 at 5 ¶ 22-23; 36-11 at 4-5 ¶ 23; 36-12 at 4 ¶ 19). For Professor McDonald, this includes issues surrounding the Israeli-Palestinian conflict. (Dkt. 36-9 at 5 ¶ 22). For Professor Scheurich, this involves racial inequality and social justice. (Dkt. 36-10 at 5 ¶ 23). In Professor Carr's case, such issues include the Holocaust and modern genocides. (Dkt. 36-11 at 4-5 ¶¶ 23-24). And for Professor Schuster, this includes issues surrounding the "culture wars" and LGBTQ rights as well as racial (and racist) historiography and the legacies of slavery. (Dkt. 36-12 at 4 ¶¶ 19-21).

In order to avoid the likelihood of running afoul of the applicable policies, they have all chilled their speech, or engaged in speech that they otherwise would not. They have changed the content they cover in their courses. For example, they have eliminated content where "divergent scholarly viewpoints" exist but, in the Professors' views, are supported by bad scholarship or are otherwise infirm, such as Holocaust revisionism, that slavery benefitted African-American people, and that Palestinians were not forcibly dispossessed. (Dkts. 36-9 at 9 ¶¶ 33-35, 10 ¶¶ 37, 39; 36-10 at 10 ¶¶ 34-35; 36-11 at 8-10 ¶¶ 35-37; 36-12 at 8-9 ¶¶ 31-33). They have changed their pedagogies, for example by curtailing or limiting open discussion, changing how they field questions, focusing more on lecture-only content delivery, concentrating on mechanics rather than content in writing assignments, eliminating discussion of germane current events, declining to share their own opinions regarding the subject matter, and suspending a "marketplace of ideas" approach to the classroom environment. (Dkts. 36-9 at 9 ¶ 35; 36-10 at 10 ¶ 35; 36-11 at 8 ¶ 35; 36-12 at 8-9 ¶¶ 31-36).

In short, they have provided particularized accounts of specifically how and why their speech is impacted by the challenged Act and policies. Moreover, as described above, the Act and policies are being actively enforced. *See Kemp*, 86 F.4th at 768 (relying on evidence of active enforcement, noting that the challenged regulation was not resting forgotten in a desk drawer). For these reasons, in addition to those establishing a credible

threat of enforcement, the impact on their speech—both in terms of chill and compulsion—is objectively reasonable.

C.    The Act and policies are the causes of the Professors' injuries

The State and Universities argue that the Professors have not been sufficiently specific regarding why or how the Act and the Policies have caused them injury. (State's Br. at 23-26; Universities' Br. at 37-40). But, as described above, the Professors have identified the specific language in the Act, adopted and implemented by the policies, that is impacting their academic speech. They have described how and why, based on that specific language, they are engaging in compelled speech and being chilled. And they have attested, without dispute, that the Act and policies are the sole reason they are being chilled and compelled.

It is not clear what more the Professors could do to illustrate the causal link between the Act/policies and their injuries—or, in the language of Article III standing—that the Professors' injuries are "fairly traceable" to the Act and policies. *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1025 (7th Cir. 2024). "A plaintiff's burden on this element is "relatively modest at this stage of the litigation. To satisfy that burden, the plaintiff need not establish that the defendant's conduct was the most immediate cause, or even a proximate cause, of the plaintiffs' injuries." *Id.* at 1025 (citations omitted). "An injury is not fairly traceable to a defendant's conduct if the causal chain is attenuated, but Article III requires no more than a meaningful connection between the two." *Pit Row,*

*Inc. v. Costco Wholesale Corp.*, 101 F.4th 493, 502 (7th Cir. 2024) (quotations and citations omitted) (cleaned up).

There is nothing attenuated about the link between the Act and policies and the injuries the Professors are suffering. They have established that their injuries are fairly traceable to the Act and policies.

II.     The Professors' academic instruction is their own speech protected by the First Amendment, and they are likely to succeed on the merits of their claim that the Act and the attendant policies violate that right

Less than a year ago this Court held, joining every other circuit to have addressed the question, that unlike other public employees, the on-the-job speech of public university faculty receives the protection of the First Amendment. *Kilborn v. Amiridis*, 131 F.4th 550, 558 (7th Cir. 2025). The State attempts here to undermine that clear decision and argues that the Professors' academic speech is not the product of their own professional expertise, but rather is the speech of the State itself. Were this so, of course, the First Amendment would not apply.

This sweeping argument serves to commandeer the speech of all public college and university faculty and, in addition to ignoring the clear holding of this Court in *Kilborn*, breaks from the unanimity of the six circuit courts to have considered the issue and to have held that faculty's academic speech, including in-class speech, research, and scholarship, is speech to which the First Amendment applies. *Id.*; *Heim v. Daniel*, 81 F.4th 212 (2d Cir. 2023); *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021); *Buchanan v. Alexander*,

919 F.3d 847 (5th Cir. 2019); *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014); *Adams v. Trs. of the Univ. of N.C.-Wilmington,* 640 F.3d 550 (4th Cir. 2011).[5]

The Act and the attendant university policies expressly regulate the Professors' protected academic expression and apply to curtail speech before it even occurs. The State and Universities cannot satisfy the heightened scrutiny required by the Supreme Court in *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995) ("*NTEU*"), and as such the Professors are likely to succeed on the merits of their claims.

A.    As this Court has already concluded, the Professors' classroom instruction is their own speech and not the government's

Much of the State's response boils down to a contention that the Professors' in-class instruction is government speech. That is, that the Professors are not delivering information based on their own expertise but are instead mouthpieces for the State which gets to exert control. Rather tellingly, the Universities do not contend that the Professors' speech belongs to the government. This "positively dystopian" arrangement, thankfully, is not so. *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1230 (N.D.

---

[5]    The Universities add the contention that the Professors do not specify exactly how the policies themselves, separate from the Act, cause any First Amendment harm. As noted in the Professors' opening brief, the Universities did not respond to the Professors' arguments in support of their likelihood of success on the merits of their claims in support of their motion for preliminary injunction and they have waived their ability to respond to the arguments. (Appellants' Br. at 30 n.9 [citing Dkt. 43 at 24-25 and *Lane v. Structural Iron Workers Loc. No. 1 Pension Tr. Fund*, 74 F.4th 445, 450 (7th Cir. 2023)]). In any event, as the Act and policies impose identical requirements, the specific harms and their causes are clear.

Fla. 2022) (preliminarily enjoining Florida's "Stop WOKE Act" where the state argued that professors' classroom speech was government speech).

As indicated above, the question of whether the Professors' teaching and pedagogy is their own speech, and at the heart of their protected academic freedom under the First Amendment, has already been definitively answered by this Court. *Kilborn*, 131 F.4th at 558 (holding that a professor's speech "involving university teaching and scholarship" was his own speech, not the government's). This should be the beginning and end of any discussion of government speech. The State's response to this obvious point is not entirely clear, but it appears to suggest that the Act and policies do not apply to speech at all. (State's Br. at 32). That is simply not a plausible reading of either the Act or the policies, as by their own terms, they regulate the Professors' in-class academic instruction by requiring, among other things, that they incorporate "a variety of political or ideological frameworks" and foster "multiple, divergent, and varied scholarly perspectives." (Appellants' Br. at 3-4).

The State next resorts to suggesting that the Act and policies, rather than regulating the Professors' academic speech (and their academic freedom), constitute curricular decisions that are government speech. This approach, too, fails.

The State's citation to a case arising in the K-12 educational context to support its contention that this is government speech, and that it can "require 'the classroom teacher' to teach (or not teach) certain matters," is inapposite. (State's Br. at 34 [citing *Webster v.*

*New Lenox Sch. Dist. No. 122*, 917 F.2d 1004, 1007 (7th Cir. 1990)]). As this Court reiterated in *Kilborn*, the doctrine of academic freedom is unique to the higher education context. 131 F.4th at 558 (addressing the difference in treatment between primary and secondary schools and post-secondary institutions of higher learning). "In singling out the public university setting from an otherwise generally applicable rule, the [Supreme] Court reaffirmed its long-held view that 'universities occupy a special niche in our constitutional tradition.'" *Id.* at 557-58 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003)). The Act and the university policies affect the speech of university professors, not K-12 classroom teachers.

The Supreme Court has long recognized "the 'essentiality of freedom in the community of American universities' which plays a 'vital role' in our democracy." *Kilborn*, 131 F.4th at 558 (quoting *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957)). "'To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation.'" *Id.* (quoting *Sweezy*, 354 U.S. at 250). And, as stressed by this Court, to safeguard academic freedom, "the First Amendment 'does not tolerate laws that cast a pall of orthodoxy over the classroom.'" *Id.* at 558 (quoting *Keyishian v. Board of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 87 (1967)). The State is dictating the speech that is required of public university professors, and the university policies do nothing more than adhere to the law (rather than face penalties for noncompliance) by implementing the Act's requirements. The First Amendment does

not permit the State to reach as it has into the classroom. *Heim*, 81 F.4th at 226-27 (university professors are paid "to speak, and to speak freely, guided by their own professional expertise, on subjects within their academic disciplines").

> B. Neither the State nor the Universities satisfy their heightened burden under *NTEU*

As explained in the Professors' opening brief, the Act and the corresponding university policies go beyond permitting *post hoc* punishment for speech, instead broadly regulating the Professors' decisions on how to teach their courses before their speech even occurs. (Appellants' Br. at 33). Such sweeping regulation of employee speech must satisfy the heightened scrutiny established in *NTEU*. This means the State and the Universities have the "heavy" burden of showing that "the interests of both potential audiences" and "employees . . . are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468 (quoting *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 571 (1968)).

As described above, the Supreme Court and this Court have articulated—in terms so fervent they would be difficult to overstate—the weight of the Professors' interest in their academic freedom and in their classroom speech. The State and Universities must overcome not just these Professors' interests in their academic freedom, but the interests of *all* faculty in controlling the content and pedagogy of their courses—and of students in hearing what these faculty members have to impart. As previously indicated, the Universities did not address this issue below, so any argument has been waived. But in

any event, their scant argument here is bare-boned and focused on undermining the Professors' interests, not in establishing their own.

The State and the Universities argue (either as a matter of balancing of interests or regarding facial, First Amendment challenges) that the Professors have not shown that a substantial number of the Act's and the attendant policies' applications involve matters of public concern. (State's Br. at 38; Universities' Br. at 41). Professor McDonald's research and courses focus on the use of music in violence, war, and social movements, and he has a specific expertise in issues relating to Israel and Palestine. (Dkt. 36-9 at 2 ¶ 7). Professor Scheurich teaches courses for current educators seeking doctoral degrees, and his research and courses focus on issues relating to race, class, gender, sexuality, and disabilities in the American educational system and society. (Dkt. 36-10 at 2 ¶ 8). Professor Carr teaches and researches in the area of media and culture, and as the director of the Institute for Holocaust and Genocide Studies, he works to support and promote teaching and research about the Holocaust and other genocides and promote public engagement in global genocide prevention efforts. (Dkt. 36-11 at 2 ¶¶ 7, 9). Professor Schuster's teaching and research focus on post-civil war U.S. history, including modern social movements and the history of medicine in the United States. (Dkt. 36-12 at 1-2 ¶¶ 6-8). That the Professors' academic work addresses matters of public concern is self-evident from both this brief summary and the Professors' own descriptions of their courses and their instruction. (Appellants' Br. at 8-16).

The fact that *Kilborn* did not create a *per se* rule that all academic speech is of public concern, 131 F.4th at 560, certainly does not mean that academic speech will not touch such matters. Much if not most university classroom speech will involve matters of public concern. Examples of classroom topics reaching matters of public concern "could readily be drawn from philosophy, history, biology, physics, or other disciplines," *Demers*, 746 F.3d at 413, so it is no stretch to conclude that the Act and the attendant policies will inhibit speech on matters of public concern in most university classrooms, and particularly the Professors'. This is consistent with *Kilborn*, which also clarified "that academic speech can be a matter of public concern even if it does not inform broader public discourse." 131 F.4th at 560.

Finally, the State misstates the interests of the Professors as seeking to "restrict[] the marketplace of ideas" while the State's interest is in "foster[ing] a culture of 'free inquiry, free expression, and intellectual diversity.'" (State's Br. at 40 [quoting Ind. Code § 21-39.5-2-1(b)]). At the same time, the State acknowledges that the Professors agree that free inquiry and free expression are important goals that they seek to implement in their classrooms, and that they sought to implement even before the Act and policies were enacted. *Id.* The Professors' interest lies in being able to make their academic decisions free from forced interference by the State. Much like forced patriotism that tramples on First Amendment freedoms, forced intellectual diversity constitutes an "unflattering estimate of the appeal of our institutions to free minds." *W. Va. State Bd. of Educ. v.*

*Barnette*, 319 U.S. 624, 641 (1943). To the extent that the State has a cognizable interest in forcing its vision of intellectual diversity, and as the Professors have previously argued (Appellants' Br. at 35-37), it does not, the State seeks to impose its views through orthodoxy. The Professors have made clear that they do not wish to restrict the marketplace of ideas; they wish to teach from their own expertise without being required to affirmatively expose students to "divergent, and varied," though irrelevant, infirm, or discredited, perspectives or to conform with the State's mandated definition of "intellectual diversity". (Appellants' Br. at 19).

The State and the Universities attempt to minimize the issues created by the Act and the corresponding university policies (and therefore the Professors' interests in the *NTEU* balance) by noting that several provisions in the Act and some university policies articulate a respect for faculty speech. (State's Br. at 36; Universities' Br. at 39-40). But neither the State nor the Universities can launder violations of the Professors' academic freedom by asserting that they tried to respect that freedom elsewhere. *See, e.g., Schneider v. State of New Jersey*, 308 U.S. 147, 163 (1939) (government cannot require a person to exercise their First Amendment freedoms in the manner of its choosing). And a statutory "savings clause instructing universities to uphold the First Amendment" does nothing when "the statute then requires universities to adopt policies that violate those very constitutional protections." *Fellowship of Christian Univ. Students at Univ. of Texas at Dallas v. Eltife*, No. 1:25-CV-1411-DAE, 2025 WL 2924228, at *12 (W.D. Tex. Oct. 14, 2025)

24

(preliminarily enjoining Texas law requiring state universities to adopt policies prohibiting certain expressive activities).

The Professors' interest in their academic speech and their students' interest in hearing that considered and expert expression outweighs any "impact on the actual operation of the Government." *NTEU*, 513 U.S. at 468. The Professors are likely to succeed on the merits of their First Amendment claims.

III.     The other factors for preliminary relief are met

The Universities' and the State's arguments as to the propriety of injunctive relief merely reiterate their arguments regarding standing and the merits—that is, in their view, the Professors are not being injured and are not facing imminent injury as the result of the challenged Act or university policies, which are, at least according to the State, constitutional. (Universities' Br. at 42-43; State's Br. at 44-45).

The other preliminary-injunction factors follow automatically from the Professors' likelihood of success on the merits. "[T]he loss of First Amendment freedoms, for even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citation omitted). And a governmental entity cannot claim that requiring it to comply with the First Amendment is harmful or burdensome. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006)(holding that if a governmental entity "is applying [a] policy in a manner that violates [the plaintiffs'] First Amendment rights . . . then [the] claimed harm is no harm at all"). Granting a preliminary

injunction will avoid a threat to constitutional rights and will not burden the State or the Universities. And "injunctions protecting First Amendment freedoms are always in the public interest." *Id.* at 859 (citations omitted).

## CONCLUSION

The district court's decision dismissing this action should be reversed. This Court should remand this matter to the district court with instructions to enter a preliminary injunction against the challenged statutory and policy provisions.

s/ Stevie J. Pactor
Counsel of Record
Kenneth J. Falk
Gavin M. Rose
Joshua T. Bleisch
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
spactor@aclu-in.org
kfalk@aclu-in.org
grose@aclu-in.org
jbleisch@aclu-in.org

Attorneys for Appellant

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief conforms to Circuit Rule 32.

1.     This brief complies with the type-volume limitations set forth in Circuit Rule 32(c) because it contains 5,632 words based on the "Word Count" feature of Microsoft Word.

2.     This brief complies with the typeface and type style requirements set forth in Circuit Rule 32 because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Palatino Linotype font for the body of the brief and 11-point font for footnotes.

/s/ Stevie J. Pactor
Stevie J. Pactor
Attorney at Law

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of December 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Service will be made on all ECF-registered counsel by operation of the Court's electronic system.

_/s/ Stevie J. Pactor_
Stevie J. Pactor
Attorney at Law
