In the

# United States Court of Appeals

## For the Seventh Circuit

––––––––––––––––––

No. 25-2366

DAVID MCDONALD, *et al.*,

*Plaintiffs-Appellants*,

*v.*

TRUSTEES OF INDIANA UNIVERSITY, in their official capacities, and TRUSTEES OF PURDUE UNIVERSITY, in their official capacities,

*Defendants-Appellees*,

*and*

STATE OF INDIANA,

*Intervenor-Appellee.*

––––––––––––––––––

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:24-cv-01575 — **Richard L. Young**, *Judge*.

––––––––––––––––––

ARGUED FEBRUARY 19, 2026 — DECIDED AUGUST 13, 2026

––––––––––––––––––

Before EASTERBROOK, PRYOR, and KOLAR, *Circuit Judges*.

KOLAR, *Circuit Judge*. Four public-university professors in Indiana preemptively challenge the state's new "intellectual

diversity" law, and certain policies that state-run universities enacted pursuant to the law, alleging that they facially violate the First and Fourteenth Amendments to the U.S. Constitution. As always, our first order of business is to ensure our jurisdiction. And Article III standing is necessary for our jurisdiction. To have standing the professors must show either a credible threat that the State or universities will enforce the law or policies against them, or an objectively reasonable chilling effect on their speech. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 639 (7th Cir. 2020) (citation omitted). They must make either showing based upon the law's or policies' "operation"—*i.e.*, text—or "enforcement." *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298 (1979).

Below and on appeal, defendants have argued that because the law does not apply to the professors directly, and because the universities' policies were "interim" in nature when the professors sued, the professors lack standing. We reject those arguments. That the act applies to the professors only indirectly through the universities' actions does not automatically deprive them of standing. Likewise, policies (interim or permanent) can give rise to standing—labeling a policy as "interim" does not insulate it from a constitutional challenge.

Nonetheless, we conclude at this early juncture and on this record that the professors have not shown that they have standing. We thus affirm the district court's judgment dismissing the complaint.

No. 25-2366    3

## I. Background

We take as true all the professors' well-pled allegations and draw all reasonable inferences in their favor. *Bria Health Services, LLC v. Eagleson*, 950 F.3d 378, 381 (7th Cir. 2020).

### A.  Senate Enrolled Act 202

Senate Enrolled Act 202 added a provision to Indiana's education code titled "The Protection of Free Inquiry, Free Expression, and Intellectual Diversity." Ind. Code art. 21-39.5 (2026); Ind. Pub. L. No. 113-2024, § 11, 2024 Ind. Acts 1742, 1746 (adding article 39.5 to title 21 of the Indiana Code "effective July 1, 2024"). The act, the State says, was meant "to clarify that a core mission of public universities is to promote 'free inquiry, free expression, and intellectual diversity.'" The act requires the boards of trustees of Indiana's seven state-run universities, among them defendants Indiana and Purdue Universities, to adopt and enforce certain policies. I.C. §§ 21-39.5-1-1, -2.

Two parts of the act are at issue here. The first is subsection 21-39.5-2-1(b), which we call the "promotion provision." It requires universities to establish a policy "that a faculty member may not be granted tenure or a promotion" if the university determines the faculty member is:

> (1) unlikely to foster a culture of free inquiry, free expression, and intellectual diversity within the institution;
>
> (2) unlikely to expose students to scholarly works from a variety of political or ideological frameworks that may exist within and are

applicable to the faculty member's academic discipline; or

(3) likely, while performing teaching duties within the scope of the faculty member's employment, to subject students to political or ideological views and opinions that are unrelated to the faculty member's academic discipline or assigned course of instruction.

*Id.* § 21-39.5-2-1(b).

The second relevant provision is subsection 21-39.5-2-2(a), which we call the "review provision." It requires a university to review tenured faculty every five years to determine whether they have met certain criteria. These criteria include "whether the faculty member" has:

(1) Helped the institution foster a culture of free inquiry, free expression, and intellectual diversity within the institution.

(2) Introduced students to scholarly works from a variety of political or ideological frameworks that may exist within the [university's] curricula[.]

(3) While performing teaching duties within the scope of the faculty member's employment, refrained from subjecting students to views and opinions concerning matters not related to the faculty member's academic discipline or assigned course of instruction.

*Id.* § 21-39.5-2-2(a) (subsections omitted).

No. 25-2366                                                    5

The act defines some but not all of the key terms in these provisions. "Faculty member" means "an employee of an institution whose employment duties include teaching students of the institution." *Id.* § 21-39.5-1-3. And "[i]ntellectual diversity" means "multiple, divergent, and varied scholarly perspectives on an extensive range of public policy issues." *Id.* § 21-39.5-1-5. But the act does not define "free inquiry" or "free expression."

The act also mandates that state-run universities give the required policies teeth. To enforce the review provision, any such university must "adopt a policy that establishes disciplinary actions" it will take if it "determines … that a tenured faculty member has failed" to meet one or more of the provision's requirements. *Id.* § 21-39.5-2-2(e). Such disciplinary actions must include: "(1) termination; (2) demotion; (3) salary reduction; (4) other disciplinary action as determined by the institution; or (5) any combination of" these actions. *Id.* A university must also create a procedure for students and staff to lodge a complaint when any faculty member (irrespective of tenure) "is not meeting the criteria described in" the review provision. *Id.* § 21-39.5-2-4(a)(1), (2). And it must refer these complaints to "appropriate human resource professionals and supervisors for consideration in employee reviews and tenure and promotion decisions." *Id.* § 21-39.5-2-4(a)(3).

The act cabins the promotion and review provisions in a few ways. It says a university "may not consider the following actions by a faculty member" when enforcing either provision:

> (1) Expressing dissent or engaging in research
> or public commentary on subjects.

(2) Criticizing the institution's leadership.

(3) Engaging in any political activity conducted outside the faculty member's teaching or mentoring duties at the institution.

*Id.* § 21-39.5-2-1(c); *see id.* § 21-39.5-2-2(d). And the act says it "may [not] be construed" to "[l]imit or restrict the academic freedom of faculty members or prevent faculty members from teaching, researching, or writing publications about diversity, equity, and inclusion or other topics." *Id.* § 21-39.5-6-1(3).

### B. The Professors' Initial Suit

Having drawn the act's contours, we turn to the professors' challenge to it.

Before the act took effect, Indiana University professors David McDonald and James Scheurich, and Purdue University professors Steven Carr and David Schuster, challenged it in federal district court. *Carr v. Trustees of Purdue University*, No. 1:24-cv-00772, 2024 WL 3819424, at *3 (S.D. Ind. Aug. 14, 2024) (*Carr I*). They brought a facial challenge, alleging the promotion and review provisions infringe on their protected speech and are unconstitutionally vague. *Id*. A week later, they sought an injunction barring the universities from enforcing the act. *Id.* at *4. The professors argued they were each uniquely injured "by the chilling effect of the requirements imposed by [the act] on their protected First Amendment activities." *Id.* at *5. They asserted that "they have already felt compelled to make changes to their syllabi in the form of their preemptive efforts to abide by [the act's] dictates," which remained unclear to them given the act's broad language. *Id.*

The State of Indiana intervened to defend the act. *Id*. at *4. And, joined by the universities, it moved to dismiss, arguing

the professors lacked Article III standing because they lacked injuries and ripe claims. *Id.*

The district court sided with the State and universities. It held no credible threat existed because the act purports to regulate university boards of trustees, not individual faculty members. *Id.* at *6. If the act does not regulate the professors directly, the court reasoned, they face no credible threat of enforcement and need not self-censor. *Id.* Thus, the court dismissed the complaint for lack of subject-matter jurisdiction. *Id.* at *7.

### C. The Professors' Present Suit

Four weeks later, the professors sued again, this time in parallel actions against the individual universities, challenging the act *and* newly minted policies the universities had adopted after the professors sued the first time. *Carr v. Trustees of Purdue University*, No. 1:24-cv-01575, 2025 WL 2106496, at *1 (S.D. Ind. July 23, 2025) (*Carr II*). And shortly thereafter, the professors sought to enjoin the promotion and review provisions of the act as violating the First and Fourteenth Amendments.

More specifically, Professors McDonald and Scheurich challenged Indiana University's policies on "Faculty and Librarian Tenure," "Faculty and Librarian Promotions," and "Faculty and Librarian Annual Reviews." Each policy merely incorporated by reference "the requirements of" the act without more. Though these policies went into effect once issued, Professor McDonald characterized them as a "stop-gap measure" until the university, its satellite campuses, and its individual departments could enact final versions.

Professors Carr and Schuster challenged similar "interim" policies adopted by Purdue University on: "Intellectual Diversity"; "Performance Reviews for Tenured, Tenure-Track, Clinical/Professional and Research Faculty"; and "Operating Procedures for Complaints Related to Intellectual Diversity." Purdue's policies, unlike Indiana's, spelled out the act's requirements in detail. But the Purdue policies—also effective when issued—merely repeated the act's requirements, so we do not reproduce them here.

The professors asserted, through their complaints, affidavits, and deposition testimony, that the act and policies infringed on their free-speech rights by forcing them to change how and what they taught. Each professor believed that the changes they felt compelled to make to their curricula ill-served their students. But they felt those changes were required by the act and policies. Below we describe some of these claimed injuries.

**Professor McDonald**. Professor McDonald, an ethnomusicologist at Indiana University, is an expert within his discipline on the Israel-Palestine conflict. He ordinarily would not teach certain "divergent" scholarly perspectives about this conflict, "including, for example, the assertion that Palestinians do not exist and that their forcible dispossession in 1948 did not occur." But he believes this is "precisely" what the act and the university's policies require of him. This belief led him to "drastically" change the readings and other materials he uses to teach. For example, he no longer assigns "canonical works of Palestinian music, literature, and poetry … fearing that such materials could potentially be challenged as one-sided" and thus expose him to "complaint, sanction, [and] demotion."

Professor McDonald is unique among the professors in that he is the only one to have received complaints about his academic activities. Four people (only one a confirmed student) complained that he espoused an "anti-Israel message" during a talk he gave in late summer 2024 titled "Politics, Thought, Voice." The complaints were lodged with a student group, which forwarded them to the university. University officials contacted Professor McDonald about the complaints. He provided them a copy of his remarks and exchanged emails with them. These officials' emails, he says, "clearly referenced" the act's intellectual-diversity mandate. In the end, Professor McDonald was not disciplined and has "heard nothing since" these events occurred.

**Professor Scheurich**. Professor Scheurich teaches at Indiana University on race, class, gender, sexuality, and disabilities in the educational system and society. He believes the act and the university's policies require him to teach about perspectives he would otherwise omit—for example, whether diversity, equity, and inclusion efforts should be part of an education system. He also worries the act and policies require him to give equal time to material that he deems "very bad scholarship." To that end, he incorporated a book he deemed bad scholarship into one of his recent courses. But his students reacted poorly and he now omits the book from his courses. He says he is "perpetually at risk of employment actions," though nothing in the record suggests he has suffered any adverse consequences to date.

**Professor Carr**. Professor Carr teaches courses on media and cultural studies at Purdue University. He similarly worries the act and policies require him to teach perspectives he believes are unsound and has altered his communications

coursework accordingly. He limited the readings he assigned in his graduate-level writing class to avoid materials a student "could potentially challenge as one-sided, even though" he considered those materials "exemplars of Communication scholarship."

**Professor Schuster**. Professor Schuster, an historian of the United States, teaches about issues like the "culture wars" surrounding the LGBTQ-rights movement in the 1990s. To teach his students to draw parallels between past and present, he used to begin each class period with an open-ended discussion of current events. But he stopped doing so. In his judgment, this sort of free-flowing discussion "poses tremendous risk" to him because "current events are often fraught with moral, political, [or] religious" import. "If a student feels unheard, dismissed, or targeted because of" a classmate's viewpoint or Professor Schuster's attempt to moderate, he feared he "may be held responsible for failing to create" the requisite "culture" of "free expression, free inquiry, and intellectual diversity."

The State intervened again to defend the act. And the district court, with the parties' consent, consolidated both actions into one. Relevant here, the State and universities then moved to dismiss for lack of standing.

The State argued the professors lacked standing because they had not alleged a concrete injury. That is, they did not allege either that their speech had reasonably been chilled in response to, or that they otherwise faced a well-founded fear of, future prosecution under the act. *See Killeen*, 968 F.3d at 638 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014)); *id.* at 639 n.1. Similarly, the universities argued the professors' challenge to the policies failed because the policies

No. 25-2366                                              11

were "interim and subject to revision amid ongoing imple-mentation efforts."

The district court credited the professors' statements that they curbed their teaching practices in fear of the act and pol-icies. *Carr II*, 2025 WL 2106496, at *6. But the court deemed their fear unreasonable because they did not face a credible threat of imminent enforcement. *Id.* The court again said the professors need not fear the act would be enforced against them because the act does not apply directly to faculty. *Id.* And the court deemed the professors' fear of the policies un-reasonable because the policies were not yet final. "At the time this lawsuit was filed," the court said, "those policies were nothing more than preliminary and interim measures, with policymaking and implementation still ongoing." *Id.* at *7. The professors "d[id] not claim that the Universities have instructed them to change their syllabi or pedagogies or that the Universities have received any complaints against them since these policies took effect." *Id.* at *8. With no "action or threatened action" taken against them, the court concluded the professors faced no credible threat of enforcement and thus lacked injury and standing. *Id.*

Accordingly, the court dismissed the suit for lack of sub-ject-matter jurisdiction and denied the professors' request for a preliminary injunction. The professors appealed. They urge us to hold they have standing and to enjoin the act and poli-cies as facially unconstitutional.

## II. Discussion

We hold that the professors lack injuries-in-fact and thus Article III standing. We affirm on this basis, and so we do not address ripeness or the professors' request for a preliminary

injunction. We stress that our inquiry is simply whether—under the applicable pleading standard—the professors have shown either a credible threat that the State or universities will enforce the law or policies against them, or an objectively reasonable chilling effect on their speech. Neither the act's indirect effect on the professors nor the interim nature of the policies is dispositive.

We proceed in two parts. First, we set out Article III's standing requirement in the context of a pre-enforcement challenge under the First Amendment. Second, we explain that the professors have not shown a sufficient injury-in-fact to sue in federal court.

### A. Article III Standing

Article III limits federal courts to deciding "Cases" and "Controversies." U.S. Const. art. III, § 2. "No matter how important a legal question or how sincere a worry, we must ensure the presence of a Case or Controversy" before addressing the merits. *Parents Protecting Our Children, UA v. Eau Claire Area School District*, 95 F.4th 501, 504 (7th Cir. 2024).

This requirement helps us "distinguish cases and controversies fit for judicial resolution from questions of public policy reserved to the elected branches or abstract disputes better left to the debating hall." *First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1121–22 (2026). We are, after all, the "least democratic branch." *Peltier v. Assumption Parish Police Jury*, 638 F.2d 21, 22 (5th Cir. 1981) (citation omitted). The requirement also reflects concerns about federalism, which are especially important "where, as here, the relief sought implicates" a state or local policy. *Parents Protecting*, 95 F.4th at 506.

No. 25-2366    13

The doctrine of standing flows from and implements the case-or-controversy requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam). It does so by requiring the party invoking federal-court jurisdiction to show (among other things) that he has suffered an injury-in-fact. *Lujan*, 504 U.S. at 560–61. A plaintiff suffers an injury-in-fact if his alleged harm is "concrete, particularized, and imminent rather than conjectural or hypothetical." *Trump*, 592 U.S. at 131 (citation omitted). If a plaintiff cannot show he has suffered an injury-in-fact, federal courts must "stay on the sidelines." *Parents Protecting*, 95 F.4th at 507.

The professors allege the act and policies are facially unconstitutional and have harmed them, but they sued before the act or policies have been enforced against them. This does not necessarily mean they lack an injury-in-fact. A plaintiff "does not have to await the consummation of [a] threatened injury to obtain preventive relief." *Center for Individual Freedom v. Madigan*, 697 F.3d 464, 473 (7th Cir. 2012) (quoting *Babbitt*, 442 U.S. at 298). Rather, a plaintiff may show injury in this context in one of two ways. *Id.* at 474. First, he may show he is *presently* injured because his speech has been chilled, meaning he has self-censored his speech in response to "an actual and well-founded fear that" a law or policy will be enforced against him. *Id.* (citation omitted). Second, he may show he faces an imminent *future* injury if he intends to engage in speech arguably protected by the First Amendment "but proscribed by" the challenged statute and faces "a credible threat of prosecution thereunder." *Babbitt*, 442 U.S. at 298.

We note these two theories of injury-in-fact often overlap. *Killeen*, 968 F.3d at 639 n.1. Both require a plaintiff to allege a

credible threat of enforcement against him. *Id.* "[W]ithout one, a putative plaintiff can establish neither" that he has "an objectively good reason for refraining from speaking and 'self-censoring'" nor "a realistic threat of legal sanction if he engages in the speech in question." *Id.* (quoting *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018); *see Greenberg v. Lehocky*, 81 F.4th 376, 388 (3d Cir. 2023) (credible threat required under both theories).

This is because the mere chilling effect of an unconstitutional law or policy being on the books is not enough to demonstrate injury-in-fact pre-enforcement. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 50 (2021). Speculation that a law or policy will be wielded in an unconstitutional manner also falls short. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983); *Schirmer v. Nagode*, 621 F.3d 581, 587–88 (7th Cir. 2010). Rather, a plaintiff must show a credible threat resulting from the "operation or enforcement" of the act or policies. *Babbitt*, 442 U.S. at 298.

## B. The Professors' Purported Injuries

With this framework in mind, we turn to our standing analysis. In doing so, we note that the district court construed the motions to dismiss as a factual challenge to standing. While a facial challenge to standing asserts that a plaintiff has not sufficiently alleged standing in his complaint, a factual challenge asserts there is in fact no standing. *In re Recalled Abbott Infant Formula Products Liability Litigation*, 97 F.4th 525, 528 (7th Cir. 2024). A factual challenge requires a plaintiff to adduce specific evidence to prove standing. *Flynn v. FCA US LLC*, 39 F.4th 946, 952 (7th Cir. 2022). In this context, "the court may consider and weigh evidence outside the pleadings to determine whether it has power to adjudicate the action."

No. 25-2366    15

*Bazile v. Finance System of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020). A district court may permit jurisdictional discovery when appropriate. *E.g.*, *North Texas Equal Access Fund v. Thomas More Society*, 728 F. Supp. 3d 887, 900 (N.D. Ill. 2024).

The parties have treated this as a factual challenge on appeal, too. They have relied on evidence outside the pleadings like affidavits and deposition testimony. We review the district court's legal conclusions *de novo* and any factual findings for clear error. *Reid L. v. Illinois State Board of Education*, 358 F.3d 511, 515 (7th Cir. 2004).

The State argues that the professors lack standing to challenge the act for a simple reason: Because the act only indirectly affects professors, the professors cannot show a credible threat of enforcement or an objectively reasonable chilling effect on their speech. So even if the professors actually fear the act will be enforced against them, the State calls this fear unreasonable.

But the professors do not lack standing merely because the act applies to them indirectly. "[G]overnmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 12–13 (1972). The act mandates that universities adopt certain policies that in turn must be applied to the professors when they seek promotion or when a university reviews their performance. *E.g.*, I.C. § 21-39.5-2-1(b). Here the State cannot insulate itself from constitutional claims by acting through a proxy, especially when that proxy is itself an arm of the State.

This is not to say the indirect nature of the act's application is irrelevant to a standing analysis. Standing is a fact-specific

inquiry and "not discernible by any precise test." *Babbitt*, 442 U.S. at 297. This includes the injury aspect, which "cannot be defined so as to make" analyzing standing "a mechanical exercise." *Allen v. Wright*, 468 U.S. 737, 751 (1984), *abrogated in part on other grounds by Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). Here, the act's indirect effect on the professors bears on whether the specter of enforcement—their purported injury—is credible. The State and universities could use that as a step in their argument that the professors lack standing. But it does not categorically preclude the professors from alleging an injury-in-fact.

Nor are we persuaded by a similar argument the State and universities renew on appeal: that the professors lack injury merely because (1) the policies they challenge can change and (2) the universities' satellite campuses and academic departments have yet to enact policies fleshing out the university-wide ones. Everyone agrees the universities' policies incorporate the act's requirements and now apply to the professors. And everyone likewise agrees that future department-specific policies must align with the act and current university-wide policies. That the universities could add to, change, or supplement policies does not necessarily mean the professors suffered no injury under the policies in force when they sued. *See Laird*, 408 U.S. at 11 (noting standing exists when a chilling effect occurs because a plaintiff is "either presently or prospectively subject to" a challenged policy). Imagine where a contrary conclusion would lead. The universities could tell the professors that they planned to bar any mention of a disfavored political party but slap an "interim" label on the policy pronouncement to avoid a constitutional challenge.

Nonetheless, we conclude the professors lack standing. The record does not show a credible threat of enforcement or an objectively reasonable chilling effect on their speech. We cannot discern how the act or policies compel the professors to self-censor as they did, or how the act or policies create a credible threat of enforcement.

The professors argue that the act and policies have curbed their protected academic speech, forcing them to: alter the readings they assign and discuss; restrict the content they present in class; and restructure their courses. But nothing on the books commands the professors to do anything concrete, including adopting these changes.

The act mandates that the universities adopt and enforce certain general policies. *E.g.*, I.C. § 21-39.5-2-1(b). It leaves to the universities filling out the details and, ultimately, judging whether faculty have complied. *Id.* § 21-39.5-2-2(a), (h)(2). The policies adopted so far merely reflect the act's general requirements; they do not reveal whether or to what extent the professors' uncensored speech would violate the act or policies.

Take, for example, Professor Scheurich's assertion that he taught a book he would not otherwise teach—one he deemed "bad scholarship"—to avoid punishment. He asserts the act and policies required this change. But he does not (and we cannot) connect this change to a concrete mandate in the act or policies. The act and policies require faculty to teach "divergent" and "scholarly" perspectives. *See id.* § 21-39.5-1-5. But they do not define "divergent" or "scholarly." Without more, we cannot determine whether Professor Scheurich had to alter his speech—by choosing now to teach this particular book in this particular course—or risk discipline. In fact, the record suggests the opposite: that any fear Professor

Scheurich had was not well-founded. He stopped teaching the book and faced no discipline.

The professors nonetheless argue they face a credible threat like the plaintiffs in *Babbitt v. United Farm Workers National Union*. But even *Babbitt* undercuts their position. In *Babbitt*, a union lodged a pre-enforcement First Amendment challenge to a criminal statute regulating consumer-publicity campaigns against agricultural products. 442 U.S. at 301. The Supreme Court concluded the union faced a credible threat of enforcement because the statute directly bore on its past and future publicity efforts, and the state had not disclaimed enforcing the statute against the union. *Id.* at 302.

The professors have not made the same showing here. They have not alleged or shown that their uncensored speech would violate the challenged act or policies. The "mere existence" of the act and policies is not enough. *Laird*, 408 U.S. at 10. An alleged injury must be "fairly traceable" to the challenged act or policy to be an injury-in-fact. *Clapper v. Amnesty International USA*, 568 U.S. 398, 409 (2013) (citation omitted). To be sure, the professors assert a fear that their uncensored speech might incur punishment under their reading of the act and policies. But this fear by itself "is insufficient to create standing" under Article III. *Id.* at 417–18. "If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id.* at 416.

Nor can we find a credible threat based on enforcement evidence. *Babbitt*, 442 U.S. at 298. We do not know how the universities have enforced or plan to enforce the act and policies, let alone whether the universities will enforce them as the professors anticipate. Indeed, it appears the universities

had not enforced the act or policies against any faculty when this suit was filed in July 2025. Of course, this standing inquiry could change if these universities enforce the policies.

The professors argue the complaints about Professor McDonald's allegedly "anti-Israel" comments show they face a credible threat of enforcement and have reasonably chilled their speech. But this episode provides little insight into what threat Professor McDonald or the other professors face from the universities under the act or policies. These complaints were lodged informally to a student group, forwarded to the university, and ultimately led nowhere: Professor McDonald was never even threatened with discipline following these complaints. It is hard to see how this complaint shows a threat of enforcement.

The professors cite, for the first time on appeal, some news articles from November and December 2025 (after they filed their complaints), reporting the universities have disciplined other faculty. Setting aside that these articles were not presented below, they do not tell us much. It would be one thing if the disciplined professors were like the professors here. But the professors here do not explain (and we cannot discern) whether they are like the disciplined professors. This particularity is an essential piece of an injury: "For either that credible threat of enforcement or chilling effect to be particularized, it must affect the *plaintiff* in a personal and individual way." *Killeen*, 968 F.3d at 638–39 (cleaned up) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)) (emphasis added). These disciplinary actions do not show a credible threat of future enforcement against the professors.

The professors also say that they face a credible threat, and thus reasonably chilled their speech, because the universities

have not disclaimed enforcing the act and policies against them. In support, they cite *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), *Brown v. Kemp*, 86 F.4th 745 (7th Cir. 2023), and *Indiana Right to Life Victory Fund v. Morales*, 112 F.4th 466 (7th Cir. 2024).

To be sure, failing to disclaim enforcement is some evidence of a credible threat. But none of these precedents say it is enough. Both *303 Creative* and *Humanitarian Law Project* cited other factors in finding a credible threat. In *303 Creative*, the state had "a history of past enforcement against nearly identical conduct" as the plaintiff's and it had not disclaimed doing the same to the plaintiff. 600 U.S. at 583. In *Humanitarian Law Project*, the plaintiffs claimed their past conduct violated the challenged statute and that they would continue this conduct absent the statute; plus, there the government had already charged about 150 people for violating the same provisions the plaintiffs challenged. 561 U.S. at 15–16. The Court was thus satisfied the plaintiffs would "be prosecuted if they do what they say they wish to do." *Id.* at 16.

Nor do *Brown* or *Indiana Right to Life Victory Fund* suggest otherwise. The plaintiffs' conduct in *Brown* fell squarely within the challenged statute; officials had threatened to prosecute them before and continued to prosecute others like them. 86 F.4th at 768–70. In *Indiana Right to Life Victory Fund*, we held that a plaintiff's well-founded fear of enforcement did not evaporate merely because some—but not all—defendants disclaimed enforcing the challenged statute. 112 F.4th at 470.

Perhaps the professors disagree with Indiana's decision to adopt the act, find the act's mandates improper, or conclude

the act is inherently dangerous because it is subject to misuse, prompting them to self-censor. But such "subjective chill" allegations are no injury. *Laird*, 408 U.S. at 13–14 (cleaned up). Permitting such a suit "would have the federal courts as virtually continuing monitors of the wisdom and soundness of" state-level policy, which "is not the role of the judiciary, absent actual present or immediately threatened injury resulting from unlawful government action." *Id.* at 15.

This is not to say the professors will never face a credible threat of enforcement or reasonably chill their speech in response to a well-founded fear. The facts on the ground could change from those in the record now, leading to a new challenge. But with no credible threat or reasonable chilling discernable here, the professors have no injury; with no injury they have no standing; and with no standing they present no case or controversy permitting federal-court intervention.

### III. Conclusion

For the reasons set forth above, we AFFIRM the district court's judgment dismissing for lack of subject-matter jurisdiction.

EASTERBROOK, *Circuit Judge,* concurring. I agree with my colleagues that plaintiffs lack standing, and I join the court's opinion fully.

What is more, I do not see how the plaintiffs have advanced a plausible argument under the First Amendment. Plaintiffs suppose that professors hold rights against universities about what shall be taught. Yet academic freedom belongs to the university. "It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail the four essential freedoms *of a university*—to determine *for itself* on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter & Harlan, JJ., concurring) (cleaned up; emphasis added). A university has the right to insist that professors *provide* the sort of education that the school *promises* to students but can deliver only through agents. See also *Kilborn v. Amidiris*, 135 F.4th 1100 (7th Cir. 2025) (opinion respecting the denial of rehearing en banc); *Urofsky v. Gilmore*, 216 F.3d 401, 412–13 (4th Cir. 2000) (en banc). Contra, *Pernell v. Florida State University System*, 181 F.4th 1135 (11th Cir. 2026). (Obviously, I agree with the dissent in *Pernell* and need not repeat what Judge Lagoa explains at length.)

Indiana University is not complaining—nor could it. The University is a part of the State of Indiana, which like other governments has a right to convey its own message. *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666 (1998); *Pleasant Grove v. Summum*, 555 U.S. 460 (2009). To enjoy this right the University must have teachers who will present the course of instruction it specifies. Professors' speech in class

has not been regulated; it has been hired. See *Garcetti v. Ceballos*, 547 U.S. 410 (2006) (First Amendment does not give employees rights vis-à-vis their employers concerning speech in the course of employment); *Mayer v. Monroe Community School Corp.*, 474 F.3d 477, 480 (7th Cir. 2007) (academic "employers are entitled to control speech from an instructor to a student on college grounds during working hours").

Many students want to receive educations in which professors "foster a culture of free inquiry, free expression, and intellectual diversity" and "refrain[] from subjecting students to views and opinions concerning matters not related to the faculty member's academic discipline or assigned course of instruction." Ind. Code §21-39.5-2-2(a). But, if plaintiffs are right, colleges that make such promises to students (and their paying parents) are powerless to deliver on them. Faculty may choose to provide tendentious screeds instead, denying their institutions the ability to provide students with a particular kind of educational experience.

Government need not specify all details in order to be a speaker. Whether to teach ethnomusicology at all, and if so how, is a question for a state university to answer, rather than for judges and juries to prescribe in the name of the First Amendment. Likewise with whether a person hired to teach economics must offer that subject rather than musicology. Indiana has chosen to specify, through Ind. Code §§ 21-39.5-1-1 to 21-39.5-6-2, only a segment of the University's educational approach, but this restraint does not prevent the University from standing on its prerogative to decide what to teach. Indiana could not compel a private university to follow the approach laid out in this statute, but Indiana may choose to offer it for itself and see how it fares in the marketplace of ideas.